UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                       :

BYONG Y. KWON,                      :
                                         :

                 Plaintiff,        :

                                         :

          -v-                   :

                                         :

DANIEL J. YUN, EMERGENT GROUP, INC.,  :        05 Civ. 1142 (GEL)
EMERGENT CAPTIAL INVESTMENT       :
MANAGEMENT, LLC, METEDECONK        :        **OPINION AND ORDER**
HOLDINGS, INC., VOYAGER ADVISORS,   :
INC., MILLENNIUM TRADITION LIMITED,  :
EMERGENT MANAGEMENT COMPANY, LLC, :
ENDURANCE ADVISORS, LIMITED, SK    :
NETWORKS CO., LTD., HYE MIN KANG,   :
JOHN DOES 1-2, and RICHARD ROES 1-2,  :
                                         :
                     Defendants.     :
-------------------------------------------------------------x

Byong Y. Kwon, pro se.

Martin Stein, Heller, Horowitz & Feit, P.C., New
York, NY, for defendants Daniel J. Yun, Emergent
Capital Investment Management, LLC, Metedeconk
Holdings, Inc., Voyager Advisors, Inc., and
Emergent Management Company, LLC.

Steven M. Hecht and Thomas E. Redburn, Jr.,
Lowenstein Sandler PC, New York, NY, for
defendant SK Networks Co., Ltd.


GERARD E. LYNCH, District Judge:

      Plaintiff Byong Y. Kwon brings this action against Daniel J. Yun and various entities

associated with him, asserting principally that (1) Yun made false representations to cause Kwon

to accept employment with certain companies controlled by Yun that operated an allegedly

fraudulent investment fund, the Millennium Fund (to the detriment of Kwon's career and

business reputation); (2) SK Networks Co., Ltd., f/k/a SK Global Co., Ltd. ("SK Networks" or "SK Global"), a South Korean corporation headquartered in Seoul, and one of its officers, Hye Min Kang, conspired with Yun to operate Millennium as a "sham investment fund," and thus are co-liable for the injuries suffered by Kwon; and (3) Yun fraudulently induced Kwon to take out a $390,000 loan from defendant Metedeconk Holdings, LLC, one of the companies controlled by Yun, which Kwon has not yet repaid. SK Networks now moves for dismissal of the complaint as to it, arguing that Kwon failed to properly serve SK and that the Court lacks personal jurisdiction over it. Yun, Emergent Capital Investment Management, Metedeconk Holdings, Voyager Advisors, and Emergent Management Company (collectively "Yun defendants") move to dismiss the complaint as to them, arguing that it states no claim upon which relief can be granted. For the following reasons, SK Networks's motion will be granted; the Yun defendants' motion will be denied.

## BACKGROUND[1]

Kwon asserts that defendant Yun, a longtime friend (Amended Complaint ¶ 50), made false representations to him primarily about the organization and structure of Millennium Tradition Limited ("Millennium"), an investment fund managed by Yun with approximately $500 million in assets (id. ¶¶ 21-22.) Because of Yun's misrepresentations, in July 2001, Kwon left a "secure" senior position with the New Valley Corporation, an investment management firm, to work for several companies controlled by Yun – defendants Emergent Group Inc., Emergent Capital Investment Management, LLC, Metedeconk Holdings, LLC, and Voyager

---

[1] This factual summary is drawn from the complaint, the factual allegations of which are accepted as true for the purpose of deciding these motions.

Advisors, LLC[2] – all of which were involved in managing, or which received income and resources from, Millennium. (Am. Compl. ¶¶ 2, 21-44.) Kwon alleges that due to additional false representations made by Yun, Kwon continued in his employment, and also was induced to borrow $390,000 from Metedeconk Holdings (the "Metedeconk Loan"), which Kwon has not yet repaid. (Id. ¶¶ 54-55.) Defendant SK Networks (then SK Global), described as "the international trading arm for SK Group, a Korean industrial conglomerate," (id. ¶ 14) was the beneficial owner of Millennium, and – through defendant Hye Min Kang, a senior finance officer of SK Networks and controlling principal of Millennium – conspired with Yun to organize and operate Millennium as a "sham investment fund." (Id. ¶¶ 58-70, 120, 124.)

In March 2003, Korean prosecutors announced the indictment of ten SK Networks senior officers, charging that SK Networks "had engaged in massive accounting fraud, resulting in $1.2 billion in losses for 2001, and in hiding debts, later determined to be $3.7 billion greater than its assets." (Id. ¶ 74.) Subsequently, Kwon discovered that the representations Yun initially made to him concerning Millennium were false, that Yun had been advised to ship documents and records relating to Millennium to the British Virgin Islands in the event of an investigation into the fund by U.S. authorities, and that Yun and Kang were planning to transfer Millennium's assets and wind down the fund, apparently in an attempt to hide its assets from authorities or SK Networks's creditors. (Id. ¶¶ 71-85.) After advising Yun to "notify U.S. authorities and [SK Networks's] creditors about [Millennium] and to not execute any transactions for [Millennium]," Kwon resigned, and has been unemployed since, despite his best efforts to secure employment.

---

[2] Defendants Emergent Group Inc., Emergent Capital Investment Management, LLC, Metedeconk Holdings, LLC, Voyager Advisors, LLC, Emergent Management Co., and Endurance Advisors, Ltd. are hereinafter collectively referred to as the "Yun Entities."

(Id. ¶¶ 86-87.)  Kwon claims that Yun's false representations caused him to give up a good job at New Valley, and that his association with Yun and Millennium has damaged his business reputation and future career prospects.  Kwon asserts claims against Yun, several Yun Entities, SK Networks, Kang, and four Doe and Roe defendants, for fraud, negligent misrepresentation, aiding and abetting fraud, and conspiracy to defraud.  He also asserts additional claims against Yun and defendants Metedeconk and Voyager for fraudulent inducement and promissory estoppel relating to the $390,000 Metedeconk loan.  (Id. ¶¶ 95-145.)

**DISCUSSION**

I. SK Networks's Motion to Dismiss

SK Networks is named in one count of the complaint, Count IV, which is entitled "Civil Conspiracy to Commit Fraud."  (Id. ¶¶ 120-27.)  Kwon alleges that due to SK Networks's involvement in the fraudulent organization and operation of Millennium, SK is liable for the false representations made by Yun relating to Millennium.  This charge is made despite the fact that Kwon does *not* allege that SK Networks knew of, authorized, or participated in Yun's efforts to employ Kwon (or anybody else).  (Id. ¶¶ 122-23, 125.)  SK Networks moves to dismiss the complaint as to it on two grounds – first, for insufficiency of service of process, Fed. R. Civ. P. 12(b)(5), and second, for lack of personal jurisdiction, Rule 12(b)(2).

A. Service of Process

The burden on a motion to dismiss for insufficient service of process rests with the plaintiff, who must, through specific factual allegations and any supporting materials, make a prima facie showing that service was proper.  See, e.g., Logicom Inclusive, Inc. v. W.P. Stewart & Co., No. 04 Civ. 0604, 2004 WL 1781009, at *4 (S.D.N.Y. Aug. 10, 2004); Darden v.

DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002); Int'l

Cultural Prop. Soc'y v. Walter de Gruyter & Co., No. 99 Civ. 12329, 2000 WL 943319, at *1

(S.D.N.Y. July 6, 2000).

SK Networks is a South Korean corporation headquartered in Seoul. (Kong Aff. ¶ 3.)

On February 22, 2005, Kwon attempted to serve SK Networks with process not through its Seoul

headquarters – an approach that would have required compliance with the procedures set forth in

the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil

or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S. 163 (Nov. 15, 1965) – but by personal

service on one Moon Ho Kim at his office in Fort Lee, New Jersey. (Kong Aff. ¶ 5; Kwon Aff.

Ex. L.) Until 2003, Kim was president, treasurer and director of SK Global America, Inc.

("SKGA"), an American subsidiary of SK Networks. (Kwon Aff. Ex. R., at 15.) In July 2003,

SKGA petitioned for bankruptcy, and in January 2005, it was dissolved and its assets were

placed in a trust for the purposes of liquidation and distribution to creditors ("SKGA trust"). (Pl.

Mem. (SK) at 8-10; Kong Aff. ¶¶ 7-8.) Kim was appointed Trustee of the SKGA trust.

According to an affidavit filed by Stephen S. Kong in support of SK Networks's motion, until

2002, Kim also worked as a senior manager for SK Networks. (Kong Aff. ¶ 6.)

Kwon argues that service on SK Networks was proper in this instance because (1) Kim

functioned as a "managing or general agent" of SKGA or the trust, either of which functioned as

a "mere department" or "agent" of SK Networks; or (2) Kim functioned directly as a managing

agent of SK Networks. See N.Y. C.P.L.R. § 311(a)(1) (authorizing service on "managing or

general agent" of foreign corporation); Darden, 191 F. Supp. 2d at 387 (noting New York law

authorizes service on domestic subsidiary where subsidiary acts as "general agent" or "mere

department" of foreign corporation).  Kwon is on solid ground in invoking New York law as a basis for assessing the adequacy of service; in Volkswagenwerk A.G.  v. Schlunk, the Supreme Court held that the Hague Convention does not preclude domestic service on a foreign corporation pursuant to state statute, where such can be accomplished.  486 U.S. 694, 707-08 (1988).  However, neither of Kwon's factual theories is adequately supported on the present record.

Under New York law, a domestic subsidiary is a "mere department" of a foreign parent only where there is "such complete control by the parent over the subsidiary that it negates the conclusion that the subsidiary is operated as a separate and independent entity."  Brandt v. Volkswagen A.G., 555 N.Y.S.2d 957, 958 (4th Dep't 1990) (collecting cases); see also Volkswagenwerk A.G.  v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984) ("[W]hen the activities of the parent show a disregard for the separate corporate existence of the subsidiary, New York jurisdiction may be asserted.").  The Second Circuit has identified four factors relevant to this inquiry – "common ownership" of the parent and subsidiary, "financial dependency of the subsidiary on the parent corporation," "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities," and "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent."  Id. at 120-22.

There is no dispute that SKGA and SK Networks were commonly owned (Am. Compl. ¶ 89).  However, the mere fact that the parent owns a majority of the stock of a subsidiary is insufficient to establish that the subsidiary is a mere department of its corporate parent.  See Pappas & Marshall v. A.J. Ross Logistics, Inc., 634 N.Y.S.2d 717, 719 (2d Dep't 1995).  Kwon

does makes certain factual allegations that would support a finding that SKGA was a department of SK Networks. As to financial dependency, Kwon alleges that prior to July 2003, over 80% of SKGA's assets and 75% of its liabilities related to business with other "SK Group" entities,[3] and that SK Networks "guaranteed virtually all of SKGA's bank debt."[4] (Am. Compl. ¶ 91.) As to SK Networks's control over SKGA's marketing and operational policies, Kwon claims, "[u]pon information and belief," that SK Networks "controlled or coordinated the general terms, conditions, pricing or nature of SKGA's related party transactions" (id. ¶ 93), which indisputably constituted an overwhelming portion of SKGA's business.[5] Kwon also alleges, upon information and belief, that SK Networks "controlled the selection and assignment of SKGA's executives, and shifted executives among the [SK] affiliates," and gives two examples, including Kim, who "worked in the tax and accounting departments" of SK Networks prior to working at SKGA, and who allegedly remained an employee of SK Networks "for the purpose of maintaining pension and other employee benefits from defendant SK Global, while working with

---

[3] Compare Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 668 (2d Cir. 1965) (subsidiary "mere department" where, inter alia, "[s]ubstantially all of [the subsidiary's] income derives from the sale and servicing of products manufactured by [the parent] or other . . . subsidiaries") with Tsegaye v. Impol Alum. Group, No. 01 Civ. 5943, 2003 WL 221743, at *5 (S.D.N.Y. Jan. 30, 2003) (no financial dependency where only 9-20% of business was with foreign parent).

[4] See Dorfman v. Marriott Int'l Hotels, Inc., No. 99 Civ. 10496, 2002 WL 14363, at *8 n.12 (S.D.N.Y. Jan. 03, 2002) (noting that when assessing financial dependency, courts typically consider, inter alia, "whether . . . the parent has guaranteed the subsidiary's obligations").

[5] See Reers v. Deutsche Bahn AG, 320 F. Supp. 2d 140, 158 (S.D.N.Y. 2004) (noting "parent's imposition of operational policies upon its subsidiaries can, in some instances, provide evidence of pervasive control," but requiring "extraordinary" degree of control). But see Beech Aircraft, 751 F.2d at 120 ("The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough.").

SKGA."  (Am. Compl. ¶ 93.)[6]

In the end, the question whether SKGA at *some* point in time functioned as a "mere department" of SK Networks is perhaps close.  However, it is the time of service, in this case February 22, 2005, which is relevant for the purpose of determining sufficiency of service.  See Gaboury v. Central Vermont Railway Co., 250 N.Y. 233, 236 (1929) (Cardozo, C.J.) (holding "time of service" relevant point in time save for "exceptional conditions" where "the cause of action is so related to business previously done as to make it unjust or unreasonable to counteract the earlier submission [to service] by . . . withdrawal").  And by the time of service in this case, SKGA no longer existed – as previously noted, by January 2005, SKGA was formally dissolved and its assets placed in a trust for the purposes of liquidation.  (Pl. Mem. (SK) at 8-10; Kong Aff. ¶¶ 7-8.)

Recognizing this difficulty, Kwon argues that SK Networks dominated SKGA's bankruptcy proceeding, and that by January 2005, SK Networks (and, to a small extent, certain other SK affiliates) was the principal beneficiary of the trust.  (Pl. Mem. (SK) at 9-10.)  However, the Court is unwilling to infer a foreign corporation's presence for the purpose of

---

[6] Even if certain SKGA employees, at one time or another, functioned in other capacities within other SK companies, more is necessary to trigger a finding of "mere department" status, such as where the parent and subsidiary's personnel are "substantially the same," evidence "mirror image symmetry," or even are substantially overlapping, such that it becomes apparent that the companies' separate corporate identities "are a mere facade."  Reers, 320 F. Supp. 2d at 157; see also Porter v. LSB Indus., 600 N.Y.S.2d 867, 873 (4th Dep't 1993) (subsidiary not shown to be "mere department" of parent even though "the directors and officers of the two entities overlap to an extent"); Jazini v. Nissan Motor Corp., 148 F.3d 181, 185 (2d Cir. 1998) (fact that one of four managing directors of Japanese parent was chairman of domestic subsidiary "does not establish that the American subsidiary is a 'mere department' of the Japanese parent").

service of process where its domestic subsidiary has ceased all business operations and has dissolved, leaving a trust established solely for the purpose of "liquidating the [trust] [a]ssets and distributing the proceeds thereof to certain [c]reditors . . . and with no objective to continue or engage in the conduct of any trade or business except to the extent reasonably necessary to , and consistent with, the liquidating purpose of the [trust]." (Kwon Aff. Ex. V, Creditor Trust Agreement, at 2), and where it is plain that the trustee, in this case Kim, was entitled to exercise his powers only in service of that liquidating purpose. (Id. at 6, 10.)

Because SKGA ceased conducting all business before the time of service, Kwon also cannot argue that SKGA or the SKGA trust was thereafter functioning as an "agent" of SK Networks, or rather, doing "all the business which [SK Networks] could do were it here by its own officials." Jazini v. Nissan Motor Corp., 148 F.3d 181, 184 (2d Cir. 1998) (quotation marks omitted); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000) ("[A] court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available.").

Finally, Kwon cannot argue that Kim functioned directly as a "managing or general agent" of SK Networks. For the reasons stated above, Kim's services to SKGA or the Trust cannot render Kim an agent of SK Networks, and SK Networks has submitted evidence, unrebutted by Kwon, that since 2002, Kim has not been employed by SK Networks directly. (Kong Aff. ¶ 6.) Kwon's conclusory allegation, upon information and belief and not discussed in his opposition papers, that after commencing his employment with SKGA, Kim remained as

"an employee" of SK Networks "for the purposes of maintaining pension and other employee benefits," also falls short. Among other reasons, that allegation says nothing about whether Kim remained an employee at the time of service, and whether Kim functioned in the capacity of a "managing or general agent," as defined under New York law. See Taylor v. Granite State Provident Ass'n, 91 Sickels 343, 346, 32 N.E. 992, 993 (N.Y. 1893) (holding "managing agent must be some person invested by the corporation with general powers involving the exercise of judgment and discretion, as distinguished from an ordinary agent or attorney, who acts in an inferior capacity, and under the direction and control of superior authority, both in regard to the extent of his duty and the manner of executing it").

For these reasons, service of the complaint on SK Networks was ineffective. In such cases, the Court has "broad discretion to dismiss the action or retain the case but quash the service that has been made on the defendant." Howard v. Klynfeld Peat Marwick Goerdeler, 977 F. Supp. 654, 658 (S.D.N.Y. 1997) (quotation marks omitted), aff'd, 173 F.3d 844 (2d Cir. 1999); accord 5B Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1354. In this case, the Court would be inclined to the latter remedy. Where a substantial corporation has received actual notice of a lawsuit, it may be entitled to insist on proper service, but the Court is reluctant to dismiss an action entirely based on a technical defect in service, especially where, as here, the corporation is willing to accept "entry of an order – as opposed to outright dismissal – requiring plaintiff to effect valid service of process before this action is allowed to proceed," (SK Mem. at 6 n.4), and where dismissal would be without prejudice and "probably would lead to the reinstitution of the suit by the plaintiff" and thus "needlessly burdens the parties with additional expense and delay and postpones the adjudication of the

controversy on its merits." 5B Wright & Miller, <u>supra</u>, § 1354. In this case, however, insufficiency of service of process is not Kwon's only problem.

B. <u>Personal Jurisdiction</u>

The standards for evaluating a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction are, generally speaking, identical to those applicable to a motion to dismiss for insufficiency of service. <u>See</u> <u>Whitaker v. Am. Telecasting, Inc.</u>, 261 F.3d 196, 208 (2d Cir. 2001); <u>Jazini</u>, 148 F.3d at 84; <u>A.C.K. Sports, Inc. v. Doug Wilson Enters.</u>, 661 F. Supp. 386, 389 (S.D.N.Y. 1987). In a diversity case, the propriety of jurisdiction over a defendant is determined under the law of the forum state, in this case New York. <u>See</u> <u>Bensusan Rest. Corp. v. King</u>, 126 F.3d 25, 27 (2d Cir. 1997); <u>Landoil Res. Corp. v. Alexander & Alexander Svcs., Inc.</u>, 918 F.2d 1039, 1043 n.4 (2d Cir. 1990).

For the reasons stated above, Kwon cannot establish this Court's jurisdiction over SK Networks through the presence of SKGA or the SKGA trust in New York (assuming that those entities were ever present here). <u>See</u> N.Y. C.P.L.R. § 301. Indeed, Kwon argues only that personal jurisdiction over SK Networks is proper under C.P.L.R. § 302(a), which allows this Court to exercise personal jurisdiction over a non-domiciliary, who "in person or through an agent," commits certain acts in New York, where the plaintiff's claim arises from those acts. Specifically, Kwon claims that jurisdiction is proper under section 302(a)(1), in that SK Networks or its agent "transacts . . . business within the state" and Kwon's claim arises from such conduct, or under section 302(a)(2), which applies where the defendant or its agent "commits a tortious act within the state[.]" Neither of these provisions provides a basis for jurisdiction over SK Networks, which, it is undisputed, has no New York office, telephone

number, property, or bank accounts, and is not licensed to do business here.  (SK Mem. at 3;
Kong Aff. ¶ 3.)

Kwon points to the following New York contacts in support of jurisdiction:

- that in June 2000, Hye Min Kang, a "senior finance officer" of SK Networks, traveled to New York to discuss with Yun the organization of Millennium in the British Virgin Islands or Cayman Islands, and its (fraudulent) operation (Am. Compl. ¶¶ 58, 124(a); Kwon Aff. Ex A);

- that on various dates in 2000, Kang e-mailed instructions to Yun, who was in New York, relating to the organization of Millennium in the British Virgin Islands or Cayman Islands (Am. Compl. ¶¶ 59-60, 124(b), (c); Kwon Aff. Exs. B, C);

- that Kang approved Yun, "a resident of New Jersey or New York," as president of Millennium, and as investment manager, EMC, a Delaware company owned by Yun with a principal place of business in New York (Am. Compl. ¶¶ 6, 12, 60-61, 75; Kwon Aff. Exs. C-D);

- that Yun and EMC opened securities accounts for Millennium at a New York bank, ING Barings, "by means of false representations about the beneficial owner and bona fide nature of the Fund," and that SK Networks and Kang, a "signatory" on those accounts, "caused the transfer of cash and securities" into them (Am. Compl. ¶¶ 46, 62; Kwon Aff. Exs. E, F, G);

- that "with or through its New York agent," SK Networks "made false representations to financial institutions in New York in connection with the issuance, and the Fund's purchase" of certain securities (Pl. Mem. (SK) at 4; Am. Compl. ¶¶ 62-64; Kwon Aff. Exs F, G, N);

- that in 2001, Kang e-mailed instructions to Yun in New Jersey for Millennium to borrow money from Bear Stearns, a New York bank, "by means of false representations about the Fund or the securities pledged as collateral for the loans" (Am. Compl. ¶¶ 65, 67-68, 124(i); Kwon Aff. Exs. G, H); and

- that Kang provided Yun with an affidavit, needed to organize the fund, which falsely represented the beneficial owner of Millennium; the affidavit was filed in the British Virgin Islands, and Yun showed the affidavit to Kwon in New York. (Am. Compl. ¶¶ 45, 82, 124(m); Kwon Aff. Exs. I, J, K.)

(Pl. Mem. (SK) at 4.)

These contacts are insufficient. As to jurisdiction under section 302(a)(1):

> [a] defendant transacts business in New York under CPLR § 302 when it has purposely availed itself of the opportunity to conduct business here, and thereby [the] benefits and protections of New York law. . . . The existence of purposeful activity should be considered in the totality of the circumstances, and jurisdiction should not be asserted against a defendant based upon random or fortuitous contacts. . . . As a rule, the minimum contacts must provide a defendant with notice that it might be subjected to suit in courts of the forum state.

Bozell Group, Inc. v. Carpet Co-op of Am. Ass'n, Inc., No. 00 Civ. 1248, 2000 WL 1523282, at *6 (S.D.N.Y. Oct. 11, 2000). Kang's approval of Yun and EMC to operate Millennium, Kang's e-mails to Yun, and his one visit to New York to discuss with Yun the operation of the fund, are no more than incidental contacts, especially where it was always contemplated that Millennium would be organized in the Cayman Islands or British Virgin Islands. (Am. Compl. ¶¶ 58, 124(a); Kwon Aff. Ex A.) See Painewebber Inc. v. Westgate Group, Inc., 748 F. Supp. 115 (S.D.N.Y. 1990) (no jurisdiction based on phone calls to New York, one visit to New York, and selection of a New York investment bank). And as to the affidavit that was supplied by Kang, which misrepresented the beneficial owner of Millennium, Kwon does not allege that it was either produced, or that Kang or any other SK Networks representative (as opposed to Yun) used such affidavit in New York; and the complaint states only that the affidavit was filed in the British Virgin Islands. It may be that Yun showed the fraudulent affidavit to Kwon in New York in

13

order to induce him to take a job or remain an employee, but as defendants point out, there is no allegation that Kang or SK Networks had any awareness that the affidavit was being used in such a manner, of that they were informed of, authorized, or participated in Yun's efforts to recruit Kwon or any other employee, or that they even had any idea who Yun employed or cared.

A closer question is posed by the approval and use of investment accounts at New York banks in connection with Millennium. However, even if that conduct were enough to show that SK Networks was "transacting business" in New York, Kwon must also show that his claim against SK Networks "arises" from that conduct. Section 302(a) requires more than a tangential relationship between the plaintiff's claim and the specified New York contacts. Courts have previously described the necessary relationship as a "substantial relationship," McGowan v. Smith, 52 N.Y.2d 268, 271-72 (1981) or "direct relation," Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 764 (2d Cir. 1983) (interpreting McGowan standard). Kwon's claim does concern the Millennium fund, but not every act relating to the fund, no matter how unrelated to the claim asserted by Kwon, is sufficiently related for jurisdictional purposes. Here, SK's New York contacts concern its efforts to organize and operate the fund, which are at best tangentially related to Yun's efforts to recruit employees to work for *his* companies, or to the specific representations made to Kwon regarding such employment, especially where it is not alleged that SK Networks or any SK representative had any awareness of or involvement with Yun's recruitment efforts.

As to jurisdiction under section 302(a)(2), that provision applies only to tortious acts committed while the defendant (or his agent) is physically present within the state. See Bensusan Rest. Corp. v. King, 126 F.3d 25, 28 (2d Cir. 1997). It is not alleged that Kang

14

committed any tort while physically present during his New York visit, let alone (for the reasons stated above) a tort from which Kwon's claim "arises."[7]

Of course, one might argue that because Kwon alleges that SK's efforts to (fraudulently) organize and operate the fund are part of the alleged conspiracy, and because acts directly relating to that conduct were committed on SK's behalf in New York, jurisdiction is proper. However, Kwon cannot benefit, in this respect, from the complaint's broad conspiracy allegations. (Am. Compl. ¶¶ 4, 120-27.) As an initial matter, it is wholly unclear how SK Networks can be charged with conspiring to defraud Kwon without any allegation that SK or Kang entered into any agreement concerning Yun's representations to Kwon (or any other prospective employee), or indeed that they had any awareness of or involvement in Yun's dealings with his employees. According to Kwon, SK Networks can be charged with liability for any tortious act committed by Yun or any other conspirator in furtherance of the larger conspiracy to fraudulently operate the Millennium fund, thus importing into New York civil tort law the much-criticized doctrine of federal criminal law that permits such co-conspirator liability where the act at issue is "reasonably foreseeable." See Linens of Europe, Inc. v. Polo Linen Svc., Inc., No. 05 Civ. 5102, 2005 WL 3500547, at *2 (S.D.N.Y. Dec. 19, 2005) (citing Pinkerton v. United States, 328 U.S. 640 (1946)). The Court has previously rejected this

---

[7] Kwon does not argue for jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), which provides for jurisdiction where a tortious act is committed outside New York but "causes injury to person or property within the state," where the tortfeasor "expects or should reasonably expect the act to have consequences in the state." While the complaint alleges that Kang and SK Networks fraudulently organized and operated the Millennium fund, it is unclear what tortious act relating to that conduct both caused injury within the state, see Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990) ("The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff."), and from which it can be said Kwon's claim "arises."

argument, id., and the parties here provide no argument on the point and thus no reason for the Court to reconsider its position.

More basically, however, plaintiff's "cause of action," for the purposes of section 302(a) and the "arising from" requirement, does not include the broad conspiratorial allegations relating to the organization and operation of Millennium, but only the acts constituting the underlying fraud claim against the Yun defendants. Even if Kwon could charge SK Networks with liability for tortious acts committed by the Yun defendants through allegations of conspiracy, "New York does not recognize civil conspiracy to commit a tort as an independent cause of action." Steier v. Schreiber, ___ N.Y.S.2d ___, 2006 WL 224051, at *3 (1st Dep't 2006). Rather, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." Alexander & Alexander of N.Y. v. Fritzen, 68 N.Y.2d 968, 969 (1986). Thus, Kwon's cause of action arises here from the Yun defendants' alleged conduct towards him, and not from any broader conspiracy between the Yun defendants and SK.[8]

For the foregoing reasons, SK Networks's motion to dismiss for lack of personal jurisdiction is granted, and the complaint is dismissed as to it.

---

[8] Kwon does not attempt to premise jurisdiction over SK Networks on *Yun's* conduct in connection with the underlying fraud (to the extent that any such conduct occurred in New York). New York law does permit an assertion of jurisdiction over an out-of-state defendant based on a co-conspirator's in-state tortious conduct in certain circumstances. See, e.g., In re Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 557-58 (S.D.N.Y. 2005). However, for the reasons stated above, Kwon cannot "make a prima facie showing of conspiracy" or show that in this respect Yun "acted at the direction or under the control of or at the request of or on behalf of" SK Networks, both of which are required showings. Id. at 557.

II.    Yun Defendants' Motion to Dismiss

The Yun defendants do not challenge the Court's jurisdiction, but move to dismiss the complaint for failure to state a claim.  In deciding such a motion, the Court construes the allegations in the complaint in the plaintiff's favor, and will dismiss the complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (quotations and citations omitted).  "This caution applies with greater force where the complaint is submitted pro se . . . ."  Id.  In addition to the facts alleged in the complaint, the Court may consider "'any written instrument attached to [the complaint] as an exhibit,' 'any statements or documents incorporated in it by reference,' and any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'"  Yung v. Lee, 432 F.3d 142, 147 (2d Cir. 2005) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)).  Where consideration of materials other than these is necessary to decide the motion, it should be converted to a motion for summary judgment, see Rule 12(b), and the court should generally delay decision until the parties have an opportunity to conduct appropriate discovery.

A.    Kwon's Claims

First, Kwon alleges that Yun made a series of misrepresentations that caused him to leave a secure investment management position at New Valley Corporation for a job with Yun, and further misrepresentations that caused Kwon to continue in that employment.

Prior to leaving his position at New Valley, Kwon alleges, Yun "assured Plaintiff that their business prospects were bright and secure given the financial resources of [Millennium,]

which defendant Yun controlled.  As an inducement, defendant Yun told Plaintiff that income and resources from the Fund would support defendants Emergent Group and ECIM, and Jordan[, companies for which Kwon would work.]  This support was essential as defendants Emergent Group and ECIM, and Jordan were not profitable."  (Am. Compl. ¶ 27.)[9]  Kwon also alleges that at or around that time, Yun misrepresented the origin and nature of Millennium, and "falsely assured Plaintiff that legal counsel had reviewed the transaction and the Fund's activities. Defendant Yun falsely represented that the structured finance transaction was bona fide, and the Fund complied with all laws."  (Id. ¶¶ 28-29.)  Kwon claims that on July 13, 2001, he received a written offer of employment that indicated, inter alia, that Kwon would be paid certain cash bonuses and would be provided with equity interests in defendant Emergent Group and Jordan.

In August 2001, Kwon resigned from his job at New Valley, and started work at Emergent Group, which along with defendants ECIM and EMC, "served as fronts, instrumentalities, agents and alter egos for defendant Yun to carry on [Millennium's] activities." (Id. ¶¶ 30-36.)  Yun later appointed Kwon to serve as chief financial officer of defendants Voyager – which managed a portion of Millennium's assets – and Metedeconk.  (Id. ¶¶ 42-43.) Kwon alleges that in January 2002, Yun made a series of additional misrepresentations concerning the ownership and organization of the fund.  (Id. ¶¶ 45-49.)  Kwon continued in his employment until his resignation in 2003, which followed the indictment of several senior SK Networks officers in Korea and Kwon's discovery of Millennium's fraudulent nature (including the involvement of SK Networks in its organization and operation).  (Id. ¶¶ 58-87.)

---

[9]  Jordan is not a defendant in this case.  Jordan, which was apparently controlled by Yun, was a precursor of defendant Voyager and functioned as "a vehicle to develop a U.S. investment advisory business."  (Am. Compl. ¶ 43.)

Second, Kwon alleges that in March 2002, defendants Yun, Metedeconk, and Voyager orally agreed to revise Kwon's compensation, promising him an increased base salary; one million shares of stock in defendant Emergent Group; future cash bonuses; and a substantial loan that would be covered in full by those bonuses. (Id. ¶¶ 51-52.) As to the loan, Kwon claims that the promise that it would be covered by his bonuses was essential as "defendants Yun, Metedeconk and Voyager explicitly knew that Plaintiff's base salary was insufficient to pay back the contemplated loans" (id. ¶ 53), and that, relying on defendants' promises and false representations about Millennium, Kwon executed two promissory notes and a security agreement, borrowing a total of $390,000 from defendant Metedeconk (id. ¶¶ 54-55.) To date, defendants have not paid to Kwon the promised cash bonuses or Emergent Group shares, and Kwon has not paid off the Metedeconk loan. (Id. ¶ 57.)

Counts I ("Fraud"), II ("Negligent Misrepresentations"), III ("Aiding and Abetting Fraud") and IV ("Civil Conspiracy to Commit Fraud") concern the alleged misrepresentations that Kwon alleges caused him to resign from New Valley and commence and continue his employment with Yun. (Id. ¶¶ 95-127.) Counts V ("Fraudulent Inducement") and VI ("Promissory Estoppel"), leveled against defendants Yun, Metedeconk, and Voyager, relate to the Metedeconk loan – Count V concerns misrepresentations relating to Millennium, which Kwon alleges caused him to take the loan, while Count VI asserts that defendants should be bound by the oral promise that the loan would be covered in full by Kwon's cash bonuses. (Id. ¶¶ 128-45.) On Counts I-IV, Kwon seeks $2.1 million in compensation for, inter alia, "loss of past and future income, damages to career growth and potential, loss of professional opportunity, damage to reputation, damage to future career, financial costs of seeking and developing

employment opportunities, and past and future legal fees related to a government investigation. (E.g., id. ¶¶ 103-05.)  On Counts V-VI, Kwon seeks cancellation of the promissory notes and security agreement relating to the Metedeconk loan.  (E.g., id. ¶¶ 138.)  However, Kwon concedes that any compensatory damages awarded may be offset by the $390,000 principal amount of the Metedeconk loan.  (Am. Compl. "Prayer for Relief," at 34.)  Kwon also seeks punitive damages and attorneys' fees.  (Id.)

 B. Analysis

  1. Counts I-IV

Defendants' principal claim is that Counts I-IV, relating to Yun's misrepresentations about Millennium, which allegedly caused Kwon to leave his former employment, take a job with Yun, and thereafter continue in that employment, fail because Kwon cannot establish reasonable reliance on such misrepresentations.  (Yun Mem. at 7-12.)  See Primedia Enthusiast Publication, Inc. v. Ashton Int'l Media, Inc., No. 02 Civ. 9997, 2003 WL 22220375, at *3 (S.D.N.Y. Sept. 25, 2003) (noting "reasonable reliance" an element of fraud under New York law); Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000) (same, in negligent misrepresentation context); Unicredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003) (aiding-and-abetting claim requires proof of underlying fraud); Rail Europe, Inc. v. Rail Pass Express, Inc., No. 94 Civ. 1506, 1996 WL 157503, at *7 (S.D.N.Y. Apr. 3, 1996) (same, in conspiracy context).[10]

---

  [10]  Defendants make two other arguments (in passing) with respect to these claims.  First, defendants claim that Yun's representation, prior to Kwon's resignation from New Valley, that Emergent Group, ECIM and Jordan would receive income and resources from Millennium (Am. Compl. ¶ 27), is not actionable because it is not alleged that Yun believed that statement to be false when it was made, and that in any case, such a "promise" is properly asserted as the basis

Defendants' argument is based on two agreements signed by Kwon, which defendants claim render reliance on any of Yun's representations unreasonable as a matter of law. First, a September 1, 2001, employment agreement between Kwon and Emergent Group states that the parties disclaim reliance on any prior oral or written representations "regarding the subject matter of this agreement," and also that the agreement "may not be amended, supplemented, canceled, or discharged except by written instrument executed by the parties." (Yun Aff. Ex. 2, at 3-4.) The second agreement is dated October 25, 2001, and is signed by eight individuals, including Kwon and Yun. The sole function of the agreement is to disclaim reliance on any prior oral or written representations between the parties "in connection with this agreement." (Id. at 2.) Defendants argue that these agreements preclude reliance on any representation that Yun may have made to Kwon. In support, they point to Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc., in which the Second Circuit held that Emergent, a sophisticated institutional investor, did not reasonably rely on oral representations concerning the assets of the defendant, a firm whose stock Emergent was purchasing. The court reasoned that because the parties were sophisticated and memorialized their dealings in a written stock purchase agreement that contained "extensive warranties and representations" and "a standard merger clause, stating

---

of a breach of contract rather than fraud action.

Both arguments are meritless. First, Kwon alleges that around the time that Yun made the representation regarding Millennium's income and resources, he also made other false representations relevant to the legality of Millennium. (Am. Compl. ¶¶ 28-29.) These allegations, coupled with Yun's representation that Millennium would provide income and resources to the otherwise unprofitable companies that Kwon would be working for, certainly pass muster. As for defendants' claim that this representation is properly the subject of a breach of contract claim, a false representation made prior to the commencement of employment that induces the plaintiff to accept such employment is the proper subject of a fraud action. See Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994).

that the agreement, together with accompanying documents, 'contained the entire understanding and agreement among the parties . . . and supersede[d] any prior understandings or agreements between or among any of them,'" if Emergent wanted to hold the defendant to its previous oral representations, it "should have protected itself by insisting that [the oral] representation be included in the stock purchase agreement." 343 F.3d 189, 193-96 (2d Cir. 2003).[11]

Defendants' argument fails. Although it is undisputed that Kwon signed the September 1, 2001, agreement, he also withdrew from the agreement prior to its ratification by the Emergent board of directors, an act required for the agreement to become effective. (Yun Reply at 1; Pl. Mem. (Yun) at 2-4.) Defendants insist that, although Kwon withdrew from the agreement, it still reveals "Kwon's then state of mind regarding oral representations; and the unreasonableness of any reliance on the alleged oral representations." (Yun Reply at 1.) To the extent the signing of the agreement is relevant to Kwon's state of mind, it is merely evidence on a question of fact to be decided at trial; the Court cannot hold as a matter of law that Kwon's reliance on any representation was unreasonable because of a proposed agreement, which Kwon ultimately rejected and which therefore never became effective, that disclaimed reliance on such representations.

As for the October 25, 2001, agreement, Kwon appears to dispute, inter alia, the applicability of this agreement to his employment relationship with the Yun entities, and thus to the representations at issue in this case. (Pl. Mem. (Yun) at 4, 7.) Indeed, it is unclear to what business relationships the October 25, 2001, agreement applies – it ambiguously states only that

---

[11] Interestingly, Emergent, a defendant in this case, has switched positions – arguing in favor of reliance on a prior oral representation in Emergent Capital, while vehemently opposing any such argument by Kwon in this case.

"each of the [eight] parties to this agreement has been, or is currently, involved in business dealings with one or more of the other parties to this agreement and/or with entities with which one or more of the other parties is affiliated." (Yun Aff. Ex. 4, at 1.) Given that the relevance of this agreement is disputed by Kwon, and that it is neither "integral" to nor referenced in the complaint, consideration of its effect is properly delayed until after the parties have had the opportunity to develop the factual record as to this document. Yung, 432 F.3d at 147 (limiting review, on a motion to dismiss, to documents referenced in and integral to the complaint, and defining "integral" as where the complaint "relies heavily upon [a document's] terms and effect").[12]

In any event, it is unclear that these agreements would dispose of Kwon's claims even if they were effective and applicable to Kwon's employment relationship with Yun and the Yun Entities. For the most part, the representations at issue in this case do not relate to the terms and conditions of Kwon's employment, which one would expect to be dealt with in an agreement concerning that relationship, but rather relate to Yun's (allegedly false) representations that the Millennium fund was legally sound. It is unclear that parties should be expected to memorialize representations concerning the legality of the employer's operations in an employment agreement (e.g., "Yun hereby represents that the Millennium fund is not a sham") or that such representations are subject to disclaimers applying only to representations "regarding the subject matter of" (Yun Aff. Ex. 2, at 3-4) or "in connection with" (id. Ex. 4, at 2) such agreements.

---

[12] For the same reason, the Court rejects defendants' argument that the October 25, 2001, agreement precludes both Kwon's claim for damages arising from the loss of his previous employment, (Yun Mem. at 15) and relief on Count VI of the complaint, which concerns the Metedeconk loan.

Finally, defendants argue that even if the claims asserted in Counts I-IV are otherwise legally sufficient, New York's "out of pocket" rule bars recovery on those claims for damage to business reputation or future career prospects, or for lost future income. (Yun Mem. at 15-16.) While New York law does limit fraud damages to "the actual pecuniary loss sustained as the direct result of the wrong," Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996); see also Kregos v. AP, 3 F.3d 656, 664 (2d Cir. 1993) ("Those losses must be the direct, immediate, and proximate result of the misrepresentation."), and does limit plaintiffs to "what they lost" and does not allow for recovery of "what they might have gained" absent the fraud, id., the line between "loss" and "gain," and "direct" and "indirect" loss, is not always clear, and will often hinge on a determination of the extent to which the damages alleged in a particular case would be " 'undeterminable and speculative.' " Lama Holding, 88 N.Y.2d at 422 (quoting Dress Shirt Sales v. Hotel Martinique Assocs., 12 N.Y.2d 339, 344 (1963)). For that reason, it is not surprising that while some decisions indicate that recovery for damage to "business reputation" and future business opportunity are not recoverable,[13] others have permitted claims for such damages to proceed.[14]

---

[13] See Kulas v. Adachi, No. 96 Civ. 6674, 1997 WL 256957, at *10 (S.D.N.Y. May 16, 1997) (dismissing claim for injury to "business reputation" and "loss of business and customers" who would have entered into agreements with plaintiff absent the fraud); Saleemi v. Pencom Sys. Inc., No. 99 Civ. 667, 2000 WL 640647, at *6-*7 (S.D.N.Y. May 17, 2000) (citing with approval Kulas's rejection of reputational and business opportunity damages).

[14] See Stewart v. Jackson & Nash, 976 F.2d 86, 87-90 (2d Cir. 1992) (permitting fraudulent inducement claim to proceed, where plaintiff claimed injuries to professional opportunity, professional reputation, and career growth and potential); Cole v. Kobs & Draft Advertising, Inc., 921 F. Supp. 220, 226 (S.D.N.Y. 1996) (permitting fraudulent inducement claim to proceed for damages to business reputation, and specifically noting that defendant's "assertion that such damages are too speculative to ascertain" failed "in light of the similar measure of damages approved by the Second Circuit in Stewart. Here, as in Stewart, the plaintiff

Whether or not a plaintiff can assert a claim for a particular reputational or prospective loss, therefore, will often require a close assessment of the facts concerning, among other things, the certainty of the loss and the potential for its quantification. In this case, a more complete factual record is necessary before the Court can decide whether Kwon may claim relief for injury to business reputation, lost career prospects, and loss of future income.

Defendants make no other argument in support of dismissal of Counts I-IV. Thus, for the reasons stated above, the Yun defendants' motion is denied as to those counts.

2. <u>Counts V-VI</u>

Defendants' arguments with respect to Counts V and VI, relating to the Metedeconk loan, are similar to the "reasonable reliance" argument made as to Counts I-IV. Here, defendants claim that Kwon's reliance on any representations relating to Millennium (Count V) or representations that the loan would be covered in full by future cash bonuses to be received by Kwon (Count VI) are unreasonable in light of promissory notes and a security agreement that allegedly omit any mention of such representations.

While the promissory notes and security agreement are referenced in the complaint (Am. Compl. ¶ 55) and thus may be considered at this stage of the proceedings, neither party has provided the Court with a copy of the notes or security agreement, or has even excerpted language from those documents that would be relevant to this issue. It is difficult for the Court to hold that, as a matter of law, these documents rendered reliance on any prior oral

---

seeks to recover for the damage to her career path resulting from a former employer's alleged fraudulent inducement scheme"); <u>Hyman v. IBM Corp.</u>, No. 98 Civ. 1371, 2000 WL 1538161, at *4 (S.D.N.Y. Oct. 17, 2000) (permitting fraud claim in employment context to proceed and stating that damages could be measured based on how long plaintiffs would have maintained prior at-will employment).

representation unreasonable without reviewing the documents themselves.  Moreover, the applicability of <u>Emergent Capital</u> to the facts of this case is not entirely clear.  In holding that reliance on an oral representation was unreasonable in light of a written agreement omitting that representation, the <u>Emergent Capital</u> court focused on the fact that the plaintiff was a sophisticated investor, that the written agreement contained numerous representations and warranties and yet omitted the oral representation at issue, and that the written agreement contained a merger clause that affirmatively disclaimed the parties' reliance on any prior representations.  <u>See</u> 343 F.3d at 193-96.

Here, Kwon's sophistication in dealing with matters of employment, or the terms of a personal loan, is not as clear as that of Emergent, a large investment firm conducting a standard stock purchase transaction.  And as to the content of the promissory notes or security agreement, defendants do not contend that they contain a merger clause or other disclaimer of prior representations or agreements, nor do they provide argument or evidence pertaining to any additional representations or warranties contained in those documents.  Finally, as to Count V, the Court notes once again its skepticism that parties to a loan agreement should be expected to memorialize representations concerning the legality of the employer's business dealings.

On the other hand, it *does* seem reasonable for Kwon to have put in writing the oral promise that defendants were to pay him cash bonuses that would cover the amount to be paid back on the Metedeconk loan, the subject of Count VI.  However, the record is nevertheless insufficient to dismiss that count at this stage, for the reasons stated above.[15]  Therefore, the Yun

---

[15]  Count VI is denominated as a "promissory estoppel" claim, a claim typically advanced in the absence of an enforceable contract.  <u>See</u> <u>Sharp v. Patterson</u>, No. 03 Civ. 8772, 2004 WL 2480426, at *11 (S.D.N.Y. Nov. 3, 2004).  Sure enough, the complaint does not advance a Kwon

defendants' motion to dismiss as to Counts V and VI is denied.[16]

## CONCLUSION

For the foregoing reasons, SK Networks's motion to dismiss is granted, and the Yun

defendants' motion to dismiss is denied.


SO ORDERED.


Dated: New York, New York
    February 21, 2006

_____
GERARD E. LYNCH
United States District Judge

_____

breach-of-contract claim explicitly; but it does state that the promises at issue in Count VI were
made to Kwon in connection with the revision of his employee compensation (Am. Compl. ¶
51), suggestive of a claim for breach of contract. It is thus unclear whether Kwon's failure to
advance such a claim in the complaint was intentional or not. Normally, the failure to explicitly
advance a claim in the complaint constitutes abandonment. However, in light of Kwon's pro se
status and because the facts relevant to a breach of contract claim would be largely, if not
entirely, identical to those relevant to the promissory estoppel claim (which may proceed), if
Kwon signals an intention to pursue a breach of contract claim, the Court will consider its
viability (if necessary) at the summary judgment stage. The Court emphasizes that it makes no
statement as to the viability of such a claim at this time; the claim is not addressed by the parties
in their legal memoranda, and its resolution would seem to require development of the factual
record as to Kwon's dealings with Yun.

[16] The Court notes that it is not entirely clear what relief Kwon seeks on Counts V and
VI. On the one hand, certain language in the complaint indicates that Kwon does not seek
freedom from the obligation to repay the $390,000 principal amount of the Metedeconk loan, but
only freedom from interest obligations (and any additional obligations other than the repayment
of the principal) imposed by the promissory notes and security agreement. (Am. Compl. ¶¶ 138,
145; id. Prayer for Relief, at 34.) On the other hand, the complaint can be interpreted as seeking
relief from *any* obligation on Metedeconk loan, including repayment of the $390,000, relief that,
if granted, would seem to give Kwon a unfair windfall. Resolution of this issue, if it becomes
necessary, can be deferred to the summary judgment stage, as defendants do not at this stage
raise any issue as to the proper measure of damages on Counts V and VI.