UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                          :
BYONG Y. KWON,                            :
                                          :
                         Plaintiff,       :
                                          :         05 Civ. 1142 (GEL)
       -v.-                               :
                                          :      **OPINION AND ORDER**
DANIEL J. YUN, et al.,                    :
                                          :
                         Defendants.      :
                                          :
-------------------------------------------------------------x

Byong Y. Kwon, New York, NY, pro se.

Martin Stein, Heller, Horowitz & Feit, P.C.,
New York, NY, for the Yun defendants.

John J. Petriello, Levy, Ehrlich & Petriello,
New York, NY, for defendant Emergent Group, Inc.


GERARD E. LYNCH, District Judge:

       Plaintiff Byong Kwon brings this action against Daniel J. Yun, Emergent Capital

Investment Management, LLC, Metedeconk Holdings, LLC, Voyager Advisors, LLC,

Millennium Tradition Limited (f/k/a Millennium Heritage, Limited), Emergent Management

Company, LLC, Endurance Advisors, Limited (collectively, the "Yun defendants"), and

Emergent Group Inc. ("Emergent"), alleging that defendants fraudulently induced him to leave

secure employment to take positions with a group of entities operating an investment fund

allegedly engaged in illegal activities, and in the process, to take out a $390,000 loan from

defendant Metedeconk Holdings, which he has not repaid.  The Yun defendants and Emergent

both move for summary judgment on plaintiff's affirmative claims.  Plaintiff, in turn, cross-

moves for summary judgment as to Metedeconk Holdings' second counterclaim.[1]  Defendants'

motions will be granted in part and denied in part.  Plaintiff's motion will be denied in its

entirety.

**BACKGROUND**

Unless otherwise stated, the following facts are undisputed or construed in the light most

favorable to the non-movant.[2]

## I.     The Parties

From August 2000 until January 2003, defendant Yun was Chairman of the Board of

Emergent,[3] a publicly held company engaged in technological and medical investments.  (Kwon

Opp. Aff. Exs. O, 174; Yun 56.1 Stmt. ¶ 3; Yun Decl. ¶ 2; Am. Compl. ¶ 7; Answer ¶ 3.)  He

also is its largest shareholder, owning approximately 17% of its common shares.  (Petriello

Supp. Decl. Ex. A.)  Emergent Capital Investment Management, LLC ("ECIM"), a hedge fund

investment management company, ceased business operations in or about December 2001 and

dissolved in or about February 2003.  (Am. Compl. ¶ 8; Answer ¶ 3.)  However, during its

---

[1] By stipulation of the parties, on May 22, 2006, the Yun defendants' first counterclaim was dismissed with prejudice.  (See Kwon Aff. Ex. C.)

[2] For citation purposes, Kwon Opp. Aff. refers to Plaintiff's Affirmation in Opposition to Motion for Summary Judgment by Defendant Emergent Group Inc.  With the exception of one paragraph (¶ 122), this affirmation appears to mirror Plaintiff's Affirmation in Opposition to Motions for Summary Judgment by the Yun Defendants and Defendant Emergent Group Inc.  Petriello Decl. refers to the Declaration of John Petriello dated April 14, 2008.  Petriello Supp. Decl. refers to the Declaration of John Petriello dated May 30, 2008.  Stein Decl. refers to the Declaration of Martin Stein dated April 4, 2008.  Stein Supp. Decl. refers to the Declaration of Martin Stein dated May 7, 2008.  Yun Decl. refers to the Declaration of Daniel Yun dated April 4, 2008.  Yun Reply Decl. refers to the Reply Declaration of Daniel Yun dated May 27, 2008.

[3] Yun continued in his capacity as an Emergent director until August 2004.  (Am. Compl. ¶ 7; Answer ¶ 3.)

2

existence, Yun was a controlling owner and managing member.  (Kwon Opp. Aff. Ex. M.)
Metedeconk Holdings, LLC ("Metedeconk"), also substantially owned and controlled by Yun,
was formed on or about October 16, 2001, and dissolved on or about December 24, 2003.  (Id.
Ex. E; Am. Compl. ¶ 9; Answer ¶ 3.)  As of December 1, 2001, when Metedeconk began
business operations, Yun was its sole manager.  (Kwon Opp. Aff. Exs. E, C at 3.)  Also its
president, he had "complete power and authority to manage and operate the Company and make
all decision affecting its business and affairs . . . within the budget and business plan approved
by the Managers, except as limited, restricted or prohibited by the express provisions of th[e]
Operating Agreement or [the Delaware Limited Liability Company Act]."  (Id. Ex. C at 3-4.)
Voyager Advisors, LLC ("Voyager"), originally known as Emergent Advisory LLC ("Emergent
Advisory"), was a registered investment adviser of which Yun was the managing member.  (Id.
Exs. K, O; Am. Compl. ¶ 10; Answer ¶ 3.)  Voyager dissolved in or about 2004.  (Am. Compl. ¶
10; Answer ¶ 3.)  Millennium Tradition ("Millennium"), of which Yun was the president and a
director, was an investment fund.  (Kwon Opp. Aff. Ex. 53.)  The only other executive officer
and director of Millennium was Chi-Po Yim.  (Id.)  Emergent Management Company, LLC
("EMC") was Millennium's investment manager.  (Am. Compl. ¶ 12; Answer ¶ 3.)  Yun was a
controlling owner and managing member of EMC, which ceased business operations in or about
January 2002, and dissolved in or about May 2002.  (Id.; Kwon Opp. Aff. Ex. 8.)  Endurance
Advisors, Limited ("Endurance"), of which Yun was the sole owner, was Millennium's
investment manager beginning in January 2002.  (Am. Compl. ¶ 13; Answer ¶ 3.)

3

II.     **Kwon's Employment with the Yun Defendants**

    A.     <u>Kwon's Engagement</u>

From February 1998 to July 2001, Kwon was employed full-time as a senior official at New Valley Corporation ("New Valley"), a publicly-traded company engaged in investment banking and real estate and technology investments in the U.S. and Russia.  (Stein Decl. Ex. 1; <u>cf</u>. Emergent 56.1 Stmt. ¶ 3; Kwon Opp. Aff. ¶ 6.)  In or about September 2000, after spending time in New Valley's Moscow office, Kwon moved to its New York office and began to work on technology investments.[4]  (Kwon Opp. Aff. ¶¶ 6-7.)  Beginning in or about June 2001, while still employed by New Valley, Kwon began discussing with Yun the possibility of being hired as chief financial officer ("CFO") to help manage Emergent, ECIM, and Jordan Advisory Corporation ("Jordan") (later renamed Emergent Asset Management ("EAM")).[5]  (<u>Id</u>. ¶ 9.) According to Kwon, Yun represented that he and his business partners managed approximately $600 million through several entities, including Millennium Tradition Limited (formerly known as Millennium Heritage, Limited), which had $500 million under management, ECIM, which had less than $10 million under management, and EAM, which had approximately $100 million under management.  (<u>Id</u>. ¶ 10.)  Yun also represented that Mark Waldron, one of his business partners, and Calvin Yee, Emergent's vice president, were moving to California to manage a medical services company recently acquired by Emergent, and that Emergent's CFO, Amy Lai,

_____

    [4] Although the Yun defendants appear to take the position that Kwon sought employment with Emergent because he wanted to spend more time in New York (Yun Mem. 5; Kwon Dep. 58), Kwon disputes this fact and notes that by the time he began employment talks with Emergent, he was already living in New York.  (Kwon Opp. Aff. ¶ 8.)

    [5] Although not a party to this litigation, Jordan, or EAM, was another business entity in which Yun and Kwon were involved.

had recently resigned.[6]  (<u>Id</u>. ¶ 11; <u>cf</u>. <u>id</u>. Ex. O.)

During the course of his talks with Yun, Kwon informed Yun that he was reluctant to leave his position at New Valley absent an assurance that his new job would be substantially secure and that his new employer would be financially stable.  (<u>Id</u>. ¶ 13.)  He also informed Yun that he wanted to continue his career in investment management, that he preferred to develop his deal experience at New Valley, and that he was concerned that leaving New Valley would damage his work history.  (<u>Id</u>.)  In light of Kwon's reservations, he and Yun discussed the future prospects for Emergent, ECIM, and EAM.  (<u>Id</u>. ¶ 14.)  While all of the entities had potential, Emergent was not profitable and ECIM and EAM did not have enough assets under management to be profitable as stand alone entities or to sustain their operations.[7]  (<u>Id</u>.)  Yun assured Kwon, however, that all three entities' business prospects were bright and their futures secure given the financial resources of Millennium.  (<u>Id</u>. ¶ 15.)  In particular, Yun represented that Millennium generated approximately $5 million in fees each year, and that he would finance and support Emergent, ECIM, and EAM with income and resources derived from Millennium.  (<u>Id</u>.)

Based on these representations, Kwon believed that Millennium would lend credibility to ECIM and EAM, both of which were fledgling investment management firms.  (<u>Id</u>. ¶ 17.)  This added credibility was significant to Kwon, as the total amount of assets being managed by a firm and its affiliated entities is a screening factor used by fund consultants in selecting investment managers and thus directly correlates to the success of an investment management firm.  (<u>Id</u>.)

---

[6] It appears that Yee's move to California may have been temporary.  (<u>See</u> Kwon Opp. Aff. Ex. O.)

[7] Emergent had, however, recently acquired a medical services company in the hopes of turning itself around.  (Kwon Opp. Aff. ¶ 14.)

The more assets a firm manages, the greater its credibility and the more successful a firm is likely to be in attracting new assets.  (Id.)  Thus, in Kwon's view, ECIM and EAM could be expected to benefit from Millennium's resources, including its management personnel and infrastructure.  (Id.)

In the course of his conversation with Yun, Kwon asked several questions about Millennium's history.  In response to these questions, Yun represented that Millennium's beneficial owner was an investment bank in Hong Kong and that the fund was created through a structured finance transaction.  (Id. ¶ 18.)  He also represented that after reviewing both the transaction and Millennium's activities, legal counsel concluded that Millennium was in compliance with all applicable laws.  (Id. ¶ 19.)

On July 13, 2001, Yun sent Kwon a letter offering him the position of CFO of Emergent.  (Petriello Decl. Ex. A.; Kwon Opp. Aff. ¶ 20; Yun 56.1 Stmt. ¶ 2; Yun Decl. ¶ 2; Emergent 56.1 Stmt. ¶ 1.)  The offer, printed on Emergent letterhead, was "subject to the execution . . . of a definitive written agreement and the approval of Emergent's board of directors."  (Petriello Decl. Ex. A.; see also Emergent 56.1 Stmt. ¶ 2.)  It provided for a "[b]ase salary of $125,000 per year with performance bonus," "[o]ptions to purchase []250,000 shares of Emergent common stock at $.01 per share, exercisable on 7/1/02," and "[e]quity interest of 2.5% in Emergent Asset Management."  (Petriello Decl. Ex. A.)  Having orally accepted the offer contained in the letter, Kwon resigned from New Valley.[8]  (Kwon Opp. Aff. ¶ 20; cf. Yun 56.1 Stmt. ¶ 4.)  Although the July 2001 letter does not mention Kwon's role in connection with any entity other than

---

[8] At the time of his resignation, Kwon was earning $400,000 per year, which consisted of a base salary of $200,000 and a cash bonus of $200,000.  (Kwon Opp. Aff. ¶ 21.)

Emergent, he was also to serve as CFO of other Emergent entities.  (Kwon Opp. Aff. Ex. 115

("Byong Y. Kwon is hereby elected to the office of chief financial officer of the Company

[ECIM]."); id. Ex. O ("Mr. Kwon shall assist EAM in establishing its infrastructure, controls and

the transfer of Jordan Advisory Assets to EAM.  I recommend that he come in next week to

speak with Calvin."); id. Ex. 108 ("Spoke to Byong for at least an hour last night.  The more I

speak to him, the more I think he's a good addition to Emergent as the "CFO" of all of our

entities.").)

　　　　After Kwon accepted the position with Emergent, but before he began work, Waldron

informed him that Emergent might face bankruptcy.  (Id. ¶ 23.)  The possibility of Emergent's

bankruptcy was highlighted in its 10-K for the year ended December 31, 2001, which advised

that "[i]n order to avoid ceasing [its] operations, a possible bankruptcy filing and in an effort to

improve [its] financial condition, during the first quarter of 2002, [Emergent] began the process

of renegotiating substantially all of [its] outstanding debt, lease, and trade obligations with [its]

key creditors."  (Id. Ex. 179 at 22.)

　　　　After advising Yun and other principals that the possibility of Emergent's bankruptcy

might make it inadvisable for him to serve as the CFO of Emergent and EAM,[9] Kwon revoked

his acceptance of the position of CFO of Emergent.  (Id. ¶ 24; see also Petriello Decl. Ex. B at

105-07.)  Instead, Yun agreed to appoint Kwon vice president of Emergent until the bankruptcy

issue became clearer.  (Kwon Opp. Aff. ¶ 25.)  Accordingly, Kwon, Emergent, ECIM, and EAM

---

　　　　[9] Because a prior change in control forced EAM to seek client approval in order to
continue its investment management contracts, Kwon was concerned that EAM might find it
difficult to renew contracts with pension fund clients if he was not only EAM's CFO, but also
the CFO of an affiliated bankrupt company.  (Kwon Opp. Aff. ¶ 24.)

agreed that Kwon would serve as a consultant to Emergent and as CFO of ECIM and EAM, and that he would be granted equity interests in Emergent and EAM, while his salary would be paid by ECIM rather than Emergent.[10]  (Id. ¶¶ 25-26 & Ex. K; Petriello Decl. Ex. C; cf. Yun 56.1 Stmt. ¶¶ 7-8.)  Despite these changes, Kwon oversaw accounting matters for Emergent until December 2001.[11]  (Kwon Opp. Aff. ¶ 27; see also id. Ex. O.)

In keeping with the foregoing arrangement, on September 1, 2001, Kwon entered into another agreement by which he would be employed as a consultant to Emergent.  (Id. Ex. C; see also id. ¶ 26.)  Shortly after Kwon signed the agreement, Yun decided to separate his business interests from Waldron's and to move Emergent's headquarters to California, the location of its sole operating subsidiary.  (Id. ¶ 40; see also id. Ex. J.)  By Kwon's account, because he did not want to move to California and work solely for Waldron, he and Yun agreed that he would continue to be employed by ECIM in New York, that he would not work for Emergent, and that Yun would not submit the consulting agreement to Emergent's Board for approval.  (Id. ¶¶ 41, 43; cf. Yun 56.1 Stmt. ¶ 8.)  Thus, on October 11, 2001, Kwon "rescinded his acceptance," noting that the "Board of Directors ha[d] yet to approve the Agreement or set a date to review

---

[10] That this arrangement was more of an amendment to Kwon's previous offer of employment than a revocation and unrelated subsequent offer of employment with other Emergent entities is supported by an October 11, 2001, letter, in which Kwon notes that he and Emergent "mutually agreed to amend the terms of [his] proposed employment so that [he] would be employed as a consultant to the Company, rather than its Chief Financial Officer."  (Petriello Decl. Ex. D.)  The Yun defendants apparently dispute this account, and maintain that Kwon simply decided that he did not want the position as CFO of Emergent.  (See Yun 56.1 Stmt. ¶ 6.)

[11] Although Kwon was included in Emergent's July 2001 payroll, this was in error.  (Petriello Decl. Ex. E at 1; Kwon Dep. at 88-89; Emergent 56.1 Stmt. ¶ 11; cf. Petriello Decl. Ex. F.)  After receiving an Emergent payroll check as a result of this error, Kwon returned the check and the check was voided.  (Petriello Decl. Ex. E at 1; cf. id. Ex. F.)

the Agreement" and the agreement was therefore not yet effective.[12] (Petriello Decl. Ex. D; see also Kwon Opp. Aff. ¶ 42.)

Several weeks later, Kwon executed a release agreement. (Kwon Opp. Aff. ¶ 46.) The agreement, dated October 25, 2001, was also signed by Yun, Waldron, Yee, Howard Waltman, Robert Adler, Matthew Fong Sr., and Paula Fong. (Id.; Stein Decl. Ex. 11 at 1.) According to Kwon, it was designed to minimize any claims asserted by Waldron in connection with the separation of Yun's and Waldron's business interests, as well as any claims from parties involved with Jordan (EAM). (Kwon Opp. Aff. ¶¶ 44-46.) Kwon maintains that this release was not intended to apply to employment-related claims, pointing out that those who signed the agreement were principals of Emergent or ECIM, and at least four of them were not employees of the defendants at all. (Id. ¶ 46; cf. id. Ex. N.) Defendants, in contrast, contend that this release was, in fact, intended to apply to Kwon's employment.

In addition to his involvement in Emergent, ECIM, and EAM, Kwon also was engaged with two other Emergent entities. On September 1, 2001, he helped form Emergent Advisory, LLC (later named Voyager Advisors, LLC), a Delaware Limited Liability Company. (Id. Ex. K at 2.) Based on the governing operating agreement, Kwon was to be the initial and sole manager of the company, as well as its president and CFO. (Id. at 2, 4.) At the end of September 2001, however, Kwon transitioned from his role as the initial and sole manager of Emergent Advisory to become merely one of several managers of the company. (See generally id. Ex. K.) He also

---

[12] As with Kwon's previous offer of employment, the consulting agreement was contingent on the approval of Emergent's Board of Directors. (Petriello Decl. Ex. D.) Although Kwon revoked his acceptance of the consulting position, this revocation does not appear to have altered Kwon's role as CFO of ECIM and EAM.

resigned as president, though he maintained his position as CFO.  (Id.)  As of March 2003, Kwon was still employed by Emergent Advisory.  (Cf. id. Ex. 55.)  Additionally, in December 2001, after resigning from ECIM,[13] Kwon became an employee of Metedeconk and an officer of Voyager.  (Id. ¶ 52.)  During that time, Yun informed him that Metedeconk received financing derived from Millennium's management fees.  (Id. ¶ 53.)  For its part, Voyager entered into an agreement to manage approximately $40 million in assets for Millennium.  This agreement was intended to give Voyager the required assets (i.e., more than $25 million) to qualify as a SEC-registered investment advisor.  (Id. ¶ 55.)  Investment management fees from Millennium would eventually be paid directly to Endurance Advisors, Limited, which in turn would pay Voyager. (Id. ¶ 56.)

     B.    <u>Kwon's Resignation</u>

From August to December 2001, Kwon had limited involvement in managing Millennium.  (Id. ¶ 57.)  Instead, Yun held primary responsibility for such management and, with the exception of Millennium's brokerage statements, kept all corporate records related to Millennium on his individual computer, rather than on the main computer server, where corporate records for Emergent and ECIM, among others, were stored.  (Id.)  In connection with a January 2002 negotiation of a proposed stock margin loan between Merrill Lynch and Millennium, Kwon renewed his inquiries regarding the beneficial owner of Millennium and the legality of its organization.  (Id. ¶¶ 58-63.)  In response to these inquiries, Yun represented that the owner was ASPAM Ltd., a Hong Kong corporation, that no written or oral agreements

---

[13] In January 2002, Yun and Waldron began to wind down ECIM and EAM.  (Kwon Opp. Aff. ¶ 51.)

existed with a Korean public company named SK Global, and that the law firm of Sonnenschein, Nath & Rosenthal had been involved in all aspects of organizing Millennium.  (Id. ¶¶ 59, 61-63.)

    In contrast to the foregoing, various e-mails between Yun and Hye Min Kang of SK Global suggest that Emergent had a relationship with SK Global as early as June 2000.  (Id. Exs. 6-7.)  In one e-mail, Yun says "[w]e are looking forward to a long and mutually profitable relationship between Emergent and SK Global."  (Id. Ex. 6.)  A subsequent e-mail dated July 5, 2000, indicates that the Emergent-SK Global relationship pertained to the establishment of Millennium.  (Id. Ex. 7.)  In response to Kang's request that Emergent "change the 2nd company name from EC Pacific to Millennium Heritage" (id. at 2), the email states: "We are [proceeding] with establishing Millennium Heritage, Limited (possibly 'Millennium Heritage Fund, Limited') in the Cayman Islands.  We are evaluating how much longer it would take if we incorporate the word 'Fund.'  If the delay is significant, we will proceed using the name Millennium Heritage, Limited. . . . Once I have confirmation on the exact name of our second entity, I will be faxing over the documents to register with the Korean securities commission."  (Id. at 1.)

    A June 27, 2000, agreement between Emergent Management Company LLC and SK Global accords with these documents.  (Id. Ex. 8.)  Pursuant to the terms of the agreement, "SK Global . . . agree[s] to appoint Emergent Management Company LLC . . . to manage a trading portfolio to be situated in the British Virgin Islands.  The sole purpose of the Fund will be to manage assets on behalf of SK."[14]  (Id.)  A March 14, 2001, letter from Yun to Kang discussing

_____

[14] Though there appears to have been an additional fund called EC Global, Limited established by the agreement of Emergent and SK Global (Kwon Opp. Aff. Ex. 7 at 1), the agreement does not specify whether it applies to Millennium or some other fund.

Emergent's management fee confirms that the companies' relationship extended into 2001, and was expected to continue at least through the end of that year.  (Id. Ex. 16.)  Following that letter, SK Global submitted to Yun for his signature a management agreement substantially similar to the June 27, 2000, agreement.  (Id. Ex. 19.)  Yun signed the agreement and returned it the same day.  (Id.)  On July 6, 2001, he explicitly confirmed that the relationship with SK Global had, in fact, taken off when he wrote to Waldron: "I will work with Dan G to start trading our Mammoth account more actively.  If we show decent performance, we should be able to get several millions *more* from SK."  (Id. Ex. 108 (emphasis added).)

After Korean prosecutors announced the indictment of certain SK Global officers for accounting fraud, an internal memorandum prepared by Kwon and other Emergent officials at Yun's request addressed defendants' potential civil and criminal liability as organizers and managers of Millennium.  (Id. Ex. 55; see also id. ¶¶ 85-87.)  In particular, it considered the potential exposure associated with misrepresenting the beneficial owner of a special purpose finance vehicle and concluded that such exposure was "serious."  (Id. Ex. 55; see also id. ¶¶ 85-87.)  The memo also noted that "even if a person were eventually found innocent of such charges his reputation would be severely damaged and he would face difficulty finding future employment in the financial services field."  (Id. Ex. 55.)

After defendants' counsel Martin Stein opined that wrongdoings related to Millennium likely would not be prosecuted if Millennium had no further presence in the U.S. and no one in the U.S. had been harmed, Yun and Stein began contemplating ways to transfer Millennium's assets outside of the U.S. and wind down its business.  (Id. ¶¶ 95-96.)  When Yun rejected Kwon's suggestion that Yun hire a while collar criminal defense lawyer rather than rely solely

on Stein's advice, Kwon resigned from Voyager, retained his own lawyer to represent his personal interests, and recused himself from all legal matters pertaining to Millennium.  (Id. ¶¶ 97-99; cf. Yun 56.1 Stmt. ¶ 9.)  Following this resignation, Kwon was employed only by Metedeconk.

After resigning from Voyager, Kwon informed Yun that Yun's plans to transfer Millennium's assets might constitute money laundering or otherwise violate the law.  (Kwon Opp. Aff. ¶ 108.)  Yun, however, responded that if he did not cover up his wrongdoing in organizing and operating Millennium, he would be imprisoned for a long time.  (Id. ¶ 109-10.) Shortly thereafter, Kwon resigned from Metedeconk and cooperated in an investigation conducted by the United States Attorney's Office.[15]  (Id. ¶¶ 112-18; cf. Yun 56.1 Stmt. ¶ 9; Stein Decl. Ex. 4.)  Because he could not take any actions that would disturb this investigation, Kwon maintains he was precluded from using contacts with former colleagues, board members, business associates and vendors to aid in his search for new employment.  (Kwon Opp. Aff. ¶¶ 117-18.)  With the exception of two temporary consulting assignments for which he was paid approximately $190,000 from April 2003 to December 2006, between the time of Kwon's resignation and his January 2007 deposition, he did not receive any substantive job interviews or secure, or engage in negotiations for, a job offer.  (Id. ¶¶ 119-20.)

## III.   The Metedeconk Loan

### A.   Metedeconk's Alleged Representations

According to Kwon, after Kwon expressed his desire to move into a larger apartment in

---

[15] Defendants contend that Kwon instigated the investigation (Yun Mem. 20-21), but Kwon denies this allegation.  (Kwon Opp. Aff. ¶ 114.)

March 2002, Yun visited a number of apartments with Kwon and, encouraging Kwon to accept one of the apartments on the spot, represented that he was going to increase Kwon's compensation significantly and that Metedeconk would loan Kwon money against his future cash bonuses.  (Id. ¶¶ 71-73.)  Yun promised that he would pay Kwon sufficient cash bonuses to repay the entire principal and interest on the contemplated loan.  (Id. ¶ 73.)  Based on these promises, Kwon agreed to rent the apartment and, upon returning to the office, Yun transferred $100,000 to Kwon's personal checking account as the first installment of the loan.  (Id. ¶ 74.)  Kwon received further loan installments until March 2003, and regularly discussed his living expenses and budget with Yun during that time.  (Id. ¶ 75.)  Yun told Kwon that a fair compensation for him would be $400,000 base salary plus cash and stock bonuses, and also repeated his promise that Kwon would receive sufficient bonuses in the future to repay the principal and interest on the outstanding loan.   (Id. ¶¶ 75-76.)

None of these promises, however, appears in either of the promissory notes (id. ¶ 79), or in any other writing.  Kwon affirms that this is because the parties had not yet determined which entity would pay his bonus, and because the notes were to be amended or replaced in connection with revised shareholder and employment agreements between Kwon and Voyager.  (Id. ¶¶ 77, 79.)  Ultimately, the business necessary to make Voyager a viable, stand-alone entity never materialized, thus obviating the need for such additional agreements.  (Id. ¶ 78.)  Kwon further attests that the relevant promissory notes – which were not the product of negotiation and were not reviewed by counsel – were based on a generic promissory note previously used by the Yun defendants.  According to Kwon, his use of this generic template was intended to be a temporary method of documenting the loan until the above-referenced issues regarding Voyager's viability

14

were resolved.  (Id. ¶¶ 80-81.)

        B.      The Promissory Notes

In total, Kwon borrowed $390,000 from Metedeconk.  (Kwon Dep. 142-43.)  The loan

was memorialized in two promissory notes (the "Notes") and a security agreement, none of

which defendants have produced.  The first promissory note, dated March 15, 2002, had an

outstanding principal of $300,000, a maturity of five years, and an interest rate of 8% per annum.

(Stein Decl. Ex. 5 at 1.)  The second promissory note, dated January 15, 2003, also had a

maturity of five years and an interest rate of 8% per annum.  (Id. Ex. 6 at 1.)  Its principal

amount, however, was $90,000.  (See id.)  For both Notes, the principal and interest are due only

upon maturity.  (Id. Exs 5-6.)  In addition, each of the Notes contains the following provision:

> 10.    Amendment; Entire Agreement.  (a) This Note may
> not be changed, waived, modified or discharged orally but only by
> an agreement in writing, signed by the party against whom
> enforcement of any such change, waiver, modification or discharge
> is sought.  This Note may not be assigned by Borrower or Lender.
> This Note shall be binding on Borrower and shall inure to the
> benefit of Lender.
>
> (b)    This Note represents the agreement of Borrower and
> Lender with respect to the subject matter hereof, and there are no
> promises, undertakings, representations or warranties by Lender
> relative to the subject matter hereof not expressly set forth or
> referred to herein or in the other Loan Documents.

(Id.; Kwon Opp. Aff. Ex. H at 2.)

According to Metedeconk, the $390,000 loan was never cancelled or distributed to any of

its members.  (Yun Reply Decl. ¶ 3.)  While Kwon disputes this fact, he acknowledges that the

Notes were executed and delivered (Am. Compl. ¶ 55), and that he has not repaid any of the

principal or interest on the $390,000.  (Kwon Dep. 142-43.)

**IV.     The Parties' Contentions**

Kwon argues that he was harmed by the defendants' false representations concerning "the financial security and stability of [his] employment[,] . . . the beneficial owner of [Millennium, and] . . . the bona-fide nature of the structured finance transaction [that allegedly created Millennium]," as well as the false representation "that all [of Millennium's] activities were legal and vetted by counsel."  (Kwon Dep. 220.)  In an effort to remedy these harms, he asserts claims of fraud, negligent misrepresentation, aiding and abetting fraud, and civil conspiracy.  He also contends that he is entitled to have the Notes memorializing the $390,000 loan declared null and void on fraudulent inducement or promissory estoppel grounds, or – in the alternative – to have Metedeconk's counterclaim dismissed because the claim does not accord with the pleadings, Metedeconk lacks capacity to sue, and Metedeconk has not complied with the Uniform Commercial Code's requirements for suing on a lost or destroyed negotiable instrument.

Defendants argue that they are entitled to summary judgment on Kwon's claims because they did not owe plaintiff any special duty, plaintiff's reliance on any alleged misrepresentations was unreasonable as a matter of law, and plaintiff has not made the requisite showing of causation.  Emergent further asserts that it cannot be held liable because any misrepresentations made by Yun were not within the scope of his employment, and because – even if they were – they did not pertain to Emergent but to other entities.  Metedeconk, for its part, contends that the Delaware Chancery Court has appointed Yun as its trustee and given him the power to participate in the instant litigation.  It also contends that it should be permitted to amend its counterclaim to reflect its intent to recover on the Notes, and that the court should consider this

16

amendment in ruling on Kwon's motion for summary judgment.

## DISCUSSION

I.      **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).  However, when moving against a party who will bear the ultimate burden of proof on an issue, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted).

Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories or other sworn evidence sufficient to create a genuine issue of material fact for trial.  See Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586; see also Trans Sport,

Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise"), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks omitted).  Rather, the nonmovant must advance "enough evidence to support a jury verdict in its favor." Trans Sport, Inc., 964 F.2d at 188.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quotation omitted).

In ruling on a motion for summary judgment, a court must construe all evidence in the light most favorable to the nonmoving party, including resolving all ambiguities and drawing all factual inferences in the nonmoving party's favor.  Rule, 85 F.3d at 1011; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Trans Sport, Inc., 964 F.2d at 188.  A court must neither make judgments regarding credibility or conflicting versions of events, nor engage in any weighing of the evidence, as a court resolving a motion for summary judgment is tasked not with resolving disputed issues of fact, but instead with determining whether any genuine issues of material fact remain to be tried.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Rule, 85 F.3d at 1011.  For purposes of making this determination, an issue is material if it "might affect the outcome of the suit under the governing law." Shade v. Hous. Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001), quoting Anderson, 477 U.S. at 248 (internal quotation marks omitted).

## II.     Kwon's Claims

### A.     Negligent Misrepresentation

Defendants argue that because plaintiff has not shown the existence of a fiduciary or

"special" relationship between the parties, his negligent misrepresentation claim must be

dismissed.  (Yun Mem. 18-19; Emergent Mem. 10-11.)  Plaintiff, however, contends that

defendants owed him a special duty of care because in 2001 he was a prospective shareholder of

EAM and the sole member of Voyager.[16]  (P. Opp. Mem. 21-22.)  As the relationship giving rise

to the harm that plaintiff seeks to redress is an employer-employee relationship, plaintiff's

argument must be rejected.

      To prevail on a claim for negligent misrepresentation, a plaintiff must show: "(1) the

defendant had a duty, as a result of a special relationship, to give correct information; (2) the

defendant made a false representation that he or she should have known was incorrect; (3) the

information supplied in the representation was known by the defendant to be desired by the

plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the

plaintiff reasonably relied on it to his or her detriment."  Hydro Investors, Inc. v. Trafalgar

Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).  In assessing the viability of a negligent

misrepresentation claim, the special relationship requirement will be satisfied only where the

defendant owes the plaintiff a fiduciary duty.  See Stewart v. Jackson & Nash, 976 F.2d 86, 90

(2d Cir. 1992).  However, "[t]he employer-employee relationship is not fiduciary in nature."

Madera v. Met. Life Ins. Co., No. 99 Civ. 4005, 2002 WL 1453827, at *8 (S.D.N.Y. July 3,

2002); see also Lind v. Vanguard Offset Printers, Inc., 857 F. Supp. 1060, 1067 (S.D.N.Y. 1994).

      Although plaintiff argues that a special relationship is created by his status as a

prospective stock purchaser, this argument is unpersuasive.  The thrust of the harm plaintiff

---

[16] Though it does not alter the analysis in any way, plaintiff acknowledges that he was a 10% member of Voyager after 2001.  (P. Opp. Mem. 22.)

alleges is not that defendants' misrepresentations induced him to purchase stock and he suffered some consequent injury.  Instead, it is that defendants made various representations to induce him to accept their offers of employment and, those representations having proven to be false, caused him to suffer certain employment-related harms.  The relationship at issue is therefore the employer-employee relationship.  As courts have routinely held that the employer-employee relationship does not constitute a special relationship sufficient to support a claim for negligent misrepresentation, plaintiff's negligent misrepresentation claim is not viable as a matter of law.  See Stewart, 976 F.2d at 90; Cannon v. Douglas Elliman, LLC, No. 06 Civ. 7092, 2007 WL 4358456, at *10-11 (S.D.N.Y. Dec. 10, 2007) (finding that promises regarding wages and other benefits made by an employer to induce plaintiffs to work in its sales office did not give rise to a fiduciary relationship sufficient to sustain a negligent misrepresentation claim); Onanuga v. Pfizer, Inc., No. 03 Civ. 5405, 2003 WL 22670842, at *3 (S.D.N.Y. Nov. 7, 2003) (concluding that the allegation that plaintiff was a lifelong employee of defendant corporation did not give rise to any special relationship for purposes of stating a negligent misrepresentation claim); Metzler v. Harris Corp., No. 00 Civ. 5847, 2001 WL 194911, at *2 (S.D.N.Y. Feb. 26, 2001) (finding that there was no fiduciary duty between plaintiff and defendant sufficient to support plaintiff's claim of negligent misrepresentation arising from defendant "inducing him to leave a secure job and accept employment [with defendant] based on the representation that he would receive commissions for any business he generated").  Accordingly, defendants' motion for summary judgment is granted in this respect.

B.      Fraudulent Inducement

To make out a claim for fraud, Kwon must prove: (1) the defendants made a material

20

misrepresentation or omission of fact; (2) that they knew to be false; (3) which was intended to

induce his reliance; (4) upon which he reasonably relied; and (5) that he was injured as a

consequence of that reliance.  See Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001);

Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996).  Kwon must also show

both transaction and loss causation.  Solar Travel Corp. v. Nachtomi, No. 00 Civ. 3564, 2001

WL 641151, at *4 (S.D.N.Y. June 8, 2001).  Defendants argue that they are entitled to summary

judgment on plaintiff's fraud claim because his reliance on any of the alleged misrepresentations

was unreasonable, and because he cannot establish the requisite causation.  (Yun Mem. 11-18;

Emergent Mem. 8-11.)  Because plaintiff's reliance was not unreasonable as a matter of law, and

because a reasonable factfinder could conclude that his injuries were the foreseeable result of the

alleged misrepresentations, this aspect of defendants' motion for summary judgment must fail.


        1.     Reasonable Reliance

"Under New York law, a plaintiff [asserting a common law fraud claim] must establish

that his reliance was justifiable, both in the sense that [he] was justified in believing the

representation and that he was justified in acting upon it."  Compania Sud-Americana de

Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 419 (S.D.N.Y. 1992).  In

determining whether a plaintiff has met this standard, courts "consider the entire context of the

transaction, including factors such as its complexity and magnitude, the sophistication of the

parties, and the content of any agreements between them."  Emergent Capital Investment Mgmt.,

LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).  Defendants argue that they are

entitled to summary judgment because plaintiff's reliance on any alleged misrepresentations was

unreasonable as a matter of law.  (Yun Mem. 15-18; cf. Emergent Reply Mem. 9.)  In support of

this argument, they cite an October 25, 2001, agreement containing a release, merger clause, and

disclaimer of oral representations.  (Yun Mem. 15-18.)  The argument, however, is meritless.

There are two situations in which a merger clause will defeat a claim of reasonable

reliance.  The first is where a "merger clause expressly references a specific subject of prior

representations."  Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 229

(S.D.N.Y. 2007).  The second is where a sophisticated party is on notice of undocumented

material facts and can therefore be deemed to have assumed the risk that those facts might not be

as represented.  See id.  Neither of these situations applies as a matter of law to this case.

The October 25, 2001, release signed by Kwon and Yun, among others, says that "each

of the parties to this agreement has been, or is currently, involved in business dealings with one

or more of the other parties to this agreement and/or with entities with which one or more of the

other parties is affiliated."  (Stein Decl. Ex. 11 at 1.)  In light of these relationships, it notes "the

intention and desire of all of the parties to this agreement to memorialize in writing all of [the]

various business relationships, rights and obligations which each of them may have with respect

to any of the other parties to the agreement; and to release each other from any and all

obligations which are not set forth in writing."  (Id.)  It goes on to state that each party to the

agreement "releases each of the other parties to th[e] agreement (and each entity in which such

other party is a principal) from any and all claims, obligations, promises, agreements or

representations which are not set forth in writing and signed by such other party (or entity in

which such other party is a principal)."  (Id. at 1-2.)  The agreement contains a merger clause

stating that it constitutes the parties' "entire understanding" and supercedes all non-written prior

22

agreements, as well as a disclaimer of any party's reliance on any oral or written representations "in connection with this agreement." (Id. at 2.)

Kwon maintains that this release was not intended to apply to his employment relationship with defendants, but rather to certain business dealings related to the separation of Yun's and Waldron's business interests, or to Jordan. (Kwon Opp. Aff. ¶¶ 44-46.)  In support of this argument, he notes that at least four other signatories were not employees of the various defendant entities, and that all of the signatories were principals of Emergent or ECIM. (Id. ¶ 46; cf. id. Ex. N.)  As the scope of the agreement, which uses the term "business dealings" rather than "employment," is not apparent from its face, defendants have not shown that the release renders plaintiff's reliance unreasonable as a matter of law.  Contrary to defendants' argument (see Yun Mem. 17), the mere fact that plaintiff signed (but later rescinded) a separate consulting agreement that also contained a merger clause does not preclude a reasonable factfinder from concluding that the October 2001 agreement did not apply to plaintiff's employment.  For these reasons, the parties' conflicting theories raise a genuine issue of material fact requiring resolution by a factfinder.

Even if the October 2001 release applied to plaintiff's employment with defendants, a general merger clause like the one appearing in the release is insufficient to defeat a claim of fraudulent inducement.  It is well-established that where a contract contains a merger clause – a recitation that the written document reflects the entirety of the parties' agreement – "parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993); see also Kleinberg v. Radian Group, Inc., No. 01 Civ. 9295, 2002 WL 31422884, at *5 (S.D.N.Y. Oct. 29, 2002).

23

However, "a general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud.  Thus, even when the contract contains 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made,' a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud."  Mfrs. Hanover Trust Co., 7 F.3d at 315 (citations omitted), quoting Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320 (1959).  The only exception to this rule is where "a contract . . . contain[s] explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement."  Sotheby's Fin. Servs., Inc. v. Baran, No. 00 Civ. 7897, 2003 WL 21756126, at *5 (S.D.N.Y. 2003); see also Mfrs. Hanover Trust Co., 7 F.3d at 315; Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, No. 01 Civ. 6600, 2005 WL 3370542, at *4 (S.D.N.Y. Dec. 12, 2005); JPMorgan Chase Bank v. Liberty Mutual Ins. Co., 189 F. Supp. 2d 24, 26 (S.D.N.Y. 2002) ("New York law will not permit a sophisticated party that, in negotiating a contract, has expressly disclaimed reliance on specific oral representations extrinsic to the contract to thereafter claim that the fraudulence of these representations is a defense to contractual performance."); Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 94-95 (1985); Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320-21 (1959).  As the release cited by defendants does not contain any sufficiently specific disclaimers, it cannot serve as the basis for precluding plaintiff's fraudulent inducement claim.

The second instance in which a general merger clause defeats a claim of reasonable reliance is equally inapplicable.  Assuming that there is a written agreement that applies to plaintiff's employment, the scope of an employment contract generally is limited to the terms and conditions of an employee's engagement with his employer.  Accordingly, representations

concerning the structure or legality of the employer's operations, or the beneficial owner of one

of the employer's funds, can hardly be considered material to the terms and conditions of one's

employment.  It is doubtful that even sophisticated parties would interpret the omission of such

representations from an employment contract as notice that the representations might be untrue.

Thus, because defendants have not shown that plaintiff's reliance on their alleged

misrepresentations was unreasonable as a matter of law, their motion for summary judgment on

this ground fails.[17]

2.      Causation

In order for a plaintiff to succeed on a fraud claim, he also must prove both transaction

and loss causation.  See, e.g., Solar Travel, 2001 WL 641151, at *4.  Transaction causation

requires a showing that the alleged misrepresentation induced plaintiff to undertake the

transaction at issue, while loss causation, "an analog of the tort concept of proximate causation,

[requires a showing] that the alleged injury 'is the natural and probable consequence of the

defrauder's misrepresentation or . . . [that] the defrauder ought reasonably to have foreseen that

the injury was a probable consequence of his fraud.'"[18]  Id. at *4-5, quoting Suez Equity

---

[17] As plaintiff's negligent misrepresentation and aiding-and-abetting fraud claims also require proof of reasonable reliance, see Solar Travel, 2001 WL 641151, at *6; UniCredito Italiano S.p.A. v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003), this analysis applies with equal force to those claims.

[18] See also Moore v. PaineWebber, Inc., 189 F.3d 165, 179 (2d Cir. 1999) (distinguishing between the definition of causation for purposes of statutory claims and the definition of causation for purposes of common law claims, and noting that "at common law, the [proximate cause] element of foreseeability is generally satisfied by a showing that the plaintiff was in a foreseeable category of persons who might be harmed."); Randolph Equities, LLC v. Carbon Capital, Inc., No. 05 Civ. 10889, 2007 WL 914234, at *8 (S.D.N.Y. Mar. 26, 2007) (noting that loss causation requires "that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered); Singer v. Jefferies & Co., Inc.,

Investors, L.P. v. Toronto-Dominion Bank, No. 99 Civ. 9042, 2001 WL 487111, at *13 (2d Cir. May 8, 2001).  "A plaintiff has [shown] loss causation with regard to the concealment or misstatement of a material fact if it [demonstrates] that its loss was foreseeable to the party alleged to have concealed or misrepresented the material fact and that its loss was caused by the materialization of the concealed (or misrepresented) fact."  Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 457 (S.D.N.Y. 2007).

Defendants argue that plaintiff has not "allege[d] that the facts allegedly concealed by the Yun defendants, once revealed, caused him to lose his job, rendered defendants unable to pay him, or caused others to refuse to hire him."  (Yun Mem. 13.)  Emergent further argues that because Kwon was never its employee, any income he lost is traceable, if at all, to other entities, and not to Emergent.[19]  (Emergent Mem. 9-10.)  These arguments, however, misconstrue the nature of plaintiff's alleged loss.  The thrust of the injury plaintiff claims is not that he lost his job with defendants, but that defendants' misrepresentations caused him to give up his job at New Valley and undermined his legitimate professional growth and reputation, given that neither Emergent nor any of the other defendant entities possessed, or was affiliated with, an investment fund of the quality allegedly represented to plaintiff.  (See, e.g., P. Opp. Mem. 22-23.)  Had

160 A.D.2d 216, 219 (1st Dep't 1990) ("[T]he element of reasonable foreseeability does not mean that the exact occurrence or precise injury need be foreseen.  It is sufficient that defendants should have been able to foresee that some injury might have resulted from their acts.") (citation omitted).

[19] Although defendants also argue that plaintiff is not entitled to damages for attorney's fees incurred in connection with the U.S. investigation into the events at issue in this case (Yun Mem. 20-21), neither side has sufficiently briefed the issue.  In light of this fact, and of plaintiff's pro se status, the Court defers resolution of the question whether such damages are properly proved until trial.

plaintiff been aware of the true facts from the outset, he likely would have chosen to remain at New Valley.

To some extent, the harm to plaintiff occurred the moment he gave up his position at New Valley for a job with defendants.  That plaintiff voluntarily revoked his acceptance of positions as Emergent's CFO and as its consultant does not necessarily render his loss attributable to his own actions.  Plaintiff has given sworn testimony to the effect that these changes in employment were amendments to the original agreement designed to accommodate Emergent's precarious position with respect to bankruptcy, EAM's unique considerations given a prior change in control, the separation of Yun's and Waldron's business interests, and the relocation of Emergent's headquarters to California.  (See Kwon Opp. Aff. ¶¶ 23-26, 40-43; Kwon Dep. 105-07; Petriello Decl. Ex. D.)  Indeed, there is evidence suggesting that the original agreement itself contemplated that Kwon would be employed not just with Emergent, but in several capacities across the related entities.  (See, e.g., Kwon Opp. Aff. Exs. O, 108, 115.) Although a factfinder would not be required to find that Emergent took the lead in determining how the affiliated entities might best use plaintiff's skills, and in adjusting the use of those skills according to the entities' shifting needs, plaintiff has advanced evidence that would permit it to do so.

In light of the foregoing, a reasonable factfinder also could conclude that plaintiff's resignation from New Valley was a foreseeable consequence – and indeed the intended consequence – of Yun's alleged misrepresentations.  As courts have held, loss of professional opportunity and reputation, and loss of benefits flowing from one's previous employment all are

cognizable losses in employment-related fraudulent inducement cases.  See, e.g., Stewart v. Jackson & Nash, 976 F.2d 86, 87-90 (2d Cir. 1992) (permitting fraudulent inducement claim to proceed where plaintiff alleged that her acceptance of defendant's offer of employment thwarted her career objective, caused a loss of professional opportunity and reputation, and damaged her "career growth and potential"); Hyman v. Int'l Business Machines Corp., No. 98 Civ. 1371, 2000 WL 1538161, at *4 (S.D.N.Y. Oct. 17, 2000) (denying defendant's motion for summary judgment and concluding that although damages for fraudulent inducement are limited to out-of-pocket losses, such damages could be calculated based on how long plaintiffs likely would have remained at their prior place of employment) (S.D.N.Y. Oct. 17, 2000); Navaretta v. Group Health Inc., 595 N.Y.S.2d 839, 841 (3d Dep't 1993) (noting that a plaintiff who prevails on a fraudulent inducement claim in the employment context "could conceivably recover for loss of benefits and salary connected with her *former* employment, as opposed to that which she would have received if her employment with defendant had continued") (emphasis in original); Singer, 160 A.D.2d at 216-19 (affirming denial of defendants' motion for summary judgment where plaintiff asserted causes of action analogous to fraud and misrepresentation and sought damages for injury to his trade and profession and his reputation).

While defendants have thus failed to establish the absence of loss causation with respect to plaintiff's foregone professional opportunities at New Valley, they are correct that loss causation cannot be proven with respect to plaintiff's claimed harm to his professional reputation and consequent inability to secure new employment.  Contrary to defendants' assertion (Yun Mem. 14-15), plaintiff's sworn testimony that he could not find work because he had "worked at many different jobs in [his] career" (Kwon Dep. 32-33) does not necessarily preclude him from

establishing that his affiliation with defendants prevented him from securing full-time employment.  However, plaintiff has advanced no other evidence that would permit a reasonable factfinder to conclude that this affiliation is, in fact, the reason he has not obtained such employment.   Plaintiff admitted that he could not recall whether an employer specifically refused him employment because of his experience with defendants.  (Kwon Dep. 31-32.)  While he presumably could have subpoenaed third parties to testify regarding *their* knowledge of employers' motivations for denying him employment, he apparently has taken no such action. Absent any evidence linking the fact of his continued unemployment to his engagement with defendants, plaintiff has failed to establish a basis upon which a reasonable trier of fact could find in his favor.  To permit him to argue causation from the mere fact that he has remained unemployed despite bona fide efforts to find employment would contravene established precedent holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise."  Trans Sport, 964 F.2d at 188, quoting Bryant, 923 F.2d at 982 (internal quotation marks omitted).  Accordingly, defendants' motion for summary judgment is granted as to plaintiff's allegations that his affiliation with defendants precluded him from obtaining full-time employment, but denied as to all other aspects of plaintiff's fraudulent inducement claim.[20]

    C.    Emergent's Vicarious Liability

    Emergent argues that it cannot be held vicariously liable under plaintiff's asserted causes of action because any representations made by Yun were not within the scope of his authority.

---

[20] Because defendants have not shown their entitlement to summary judgment on plaintiff's fraud claim, their motion for summary judgment is also denied as to plaintiff's civil conspiracy claim.

(Emergent Mem. 7-8.)  Because principles of agency are not the only possible basis for Emergent's liability, Emergent's motion for summary judgment is denied.

It is well-settled that a principal is liable only for the conduct of an agent acting within the scope of his actual or apparent authority.  See, e.g., Barone v. Marone, No. 04 Civ. 2001, 2007 WL 4458118, at *5 n.11 (S.D.N.Y. Dec. 14, 2007); McGarry v. Miller, 158 A.D.2d 327, 328 (1st Dep't 1990), citing Greene v. Hellman, 51 N.Y.2d 197.  In particular, "a principal may be held liable in tort for the misuse by its agent of his apparent authority to defraud a third party who reasonably relies on the appearance of authority, even if the agent commits the fraud solely for his personal benefit, and to the detriment of the principal."  Parlato v. Equitable Life Ass. Soc'y, 749 N.Y.S.2d 216, 220-21 (1st Dep't 2002).  Apparent authority exists only where there has been "a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal – not the agent."  Herbert Construction Co. v. Continental Ins. Co., 931 F.2d 989, 993 (2d Cir. 1991), quoting Ford v. Unity Hosp., 32 N.Y.2d 464, 472-73 (1973); see also Fennell v. TLB Kent Co., 865 F.2d 498, 503 (2d Cir. 1989) (noting that apparent authority requires "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction") (emphasis omitted), quoting Hallock v. State, 64 N.Y.2d 224, 231 (1984).

Presumably, defendants' arguments against agency liability are based on plaintiff's failure to make any showing that Emergent, as the principal, took some misleading action that caused Kwon to rely upon Yun's misrepresentations.  (Cf. Yun Mem. 8.)  Assuming, arguendo, that defendants are correct, they still have not demonstrated that, as a matter of law, they are

exempt from liability on other grounds.  The principal-agent relationship is but one basis for

vicarious liability.  Regardless of whether Kwon can demonstrate Yun's apparent authority,

under the doctrine of *respondeat superior*, Emergent can be held liable for torts committed by its

officers or employees while those officers or employees are acting within the scope of their

employment.  See Annunziata v. City of New York, No. 06 Civ. 7637, 2008 WL 2229903, at *3

(S.D.N.Y. May 28, 2008); Staples, Inc. v. W.J.R. Assocs., No. 04 Civ. 904, 2007 WL 3046352,

at *3 (E.D.N.Y. Sept. 28, 2007); Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier &

Rice, Inc., No. 03 Civ. 0377, 2003 WL 21767739, at *3 (S.D.N.Y. July 30, 2003); Riviello v.

Waldron, 47 N.Y.2d 297, 302 (1979).

Although "[a]n employer will not be held liable under this doctrine for actions which

were not taken in furtherance of the employer's interests and which were undertaken by the

employee for wholly personal motives," Adorno v. Correctional Servs. Corp., 312 F. Supp. 2d

505, 516 (S.D.N.Y. 2004) (alteration in original), quoting Galvani v. Nassau County Police

Indemnification Review Bd., 242 A.D.2d 64, 68 (2d Dep't 1998), it also will "not [be] excused

from liability 'merely because [its] employees, acting in furtherance of [its] interests, exhibit

human failings and perform negligently or otherwise than in an authorized manner.'"  Adorno,

312 F. Supp. 2d at 516, quoting Riviello, 47 N.Y.2d at 302.  Instead, the question is "whether the

act was done while the servant was doing his master's work, no matter how irregularly, or with

what disregard of instructions."  Adorno, 312 F. Supp. 2d at 516, quoting Riviello, 47 N.Y.2d at

302.


In determining whether a tortious act was committed within the scope of employment,

the New York Court of Appeals has identified several factors as relevant: (1) "the connection between the time, place and occasion for the act," (2) "the history of the relationship between employer and employee as spelled out in actual practice," (3) "whether the act is one commonly done by such an employee," (4) "the extent of departure from normal methods of performance," and (5) "whether the specific act was one that the employer could reasonably have anticipated." Riviello, 47 N.Y.2d at 303.  "While all five factors are considered, New York courts generally place greater emphasis on the fifth factor, namely, whether the acts involved . . . could reasonably have been anticipated by [the] employer." Mingo v. United States, 274 F. Supp. 2d 336, 346 (E.D.N.Y. 2003).  Because the element of general foreseeability is fact-laden, it is usually best reserved for the factfinder.  See Pizzuto v. County of Nassau, 239 F. Supp. 2d 301, 313 (E.D.N.Y. 2003).  However, where the relevant facts are not in dispute, a court may make the determination as a matter of law.  See id.  In assessing this requirement, courts have held that an "employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." Adorno, 312 F. Supp. 2d at 516, quoting Riviello, 47 N.Y.2d at 304.  Accordingly, for purposes of *respondeat superior* liability, even an employee who commits an intentional tort may be found to have acted within the scope of his employment.  See Adorno, 312 F. Supp. 2d at 516; Pizzuto, 239 F. Supp. 2d at 313.

The record in this matter contains sufficient evidence to support a finding that Yun acted in Emergent's interests when he made representations concerning Millennium's organization, beneficial ownership, and relationship to the defendant entities.  At the time Yun made the alleged misrepresentations, he was Chairman of the Board of Emergent.  (Kwon Opp. Aff. Exs.

O, 174.)  In extending Emergent's initial offer to employ Kwon as its CFO, Yun wrote to Kwon

using Emergent letterhead.[21]  (Petriello Decl. Ex. A.)  Although the Board was required to

approve the offer (see id.), these actions suggest that the Board was well aware that Yun would

be extending offers of employment in his capacity as Chairman.  This is not a situation in which

Yun's actions were shrouded in secrecy, thus casting doubt on their legitimacy.  To the contrary,

Yun appears to have discussed plaintiff's offer of employment, as well as plaintiff's potential

duties, with other officials affiliated with the defendants.  (See Kwon Opp. Aff. Exs. O, 108.)

Moreover, it is not unreasonable to conclude that an employee or officer negotiating or

extending offers of employment would likely make certain representations about the employer in

an effort to induce an attractive candidate to accept an offer.

While Emergent suggests that it cannot be held liable for harm caused by the alleged

misrepresentations because the misrepresentations pertained to entities other than Emergent or

because Kwon was never actually employed by Emergent (Emergent Mem. 9-10; Emergent

Reply Mem. 4), these arguments are meritless.  According to Kwon, the changes in his

employment arrangements with Emergent and the Yun defendants were nothing more than

amendments made to account for Emergent's potential bankruptcy, EAM's unique needs

resulting from a prior change in control, the separation of Yun's and Waldron's business

interests, and the relocation of Emergent's headquarters to California.  (See Kwon Opp. Aff. ¶¶

23-26, 40-43; Kwon Dep. 105-07; Petriello Decl. Ex. D.)  Kwon's theory that his involvement

with Emergent was intended to include involvement in several related entities is corroborated not

---

[21] While Kwon ultimately rescinded his acceptance of this particular written offer, Yun's
offer on Emergent letterhead still provides circumstantial evidence that negotiating and
extending offers of employment was within Yun's scope of employment.

only by documents indicating that he was expected to serve as Emergent's CFO, and as the CFO

of ECIM, EAM, and Voyager (see Kwon Opp. Aff. Exs. K, O, 115), but also by a July 6, 2001,

e-mail from Yun to Waldron, which stated: "Spoke to Byong for at least an hour last night.  The

more I speak to him, the more I think he's a good addition to Emergent as the "CFO" of all of

our entities."  (Kwon Opp. Aff. Ex. 108.)  On this theory, it was in Emergent's interests for

Kwon to become employed by the defendants and Yun's alleged misrepresentations induced him

to do so.  While a jury may well reject the theory, resolution of the matter requires credibility

determinations properly reserved for a factfinder.  Emergent has therefore failed to demonstrate

that it cannot be held liable as a matter of law.  Accordingly, its motion for summary judgment is

denied as to the issue of vicarious liability.

## III.   Metedeconk's Counterclaim

### A.   Leave To Amend

Plaintiff argues that because Metedeconk's counterclaim refers to his $390,000 loan as a

"demand loan" and he never borrowed money from Metedeconk as a demand loan, the

counterclaim should be dismissed.  (P. Mem. 2-3.)  Metedeconk, however, argues that

defendants have referenced the promissory notes at issue on numerous occasions and plaintiff is

therefore precluded from arguing that he has no knowledge of the basis of its claim.

(Metedeconk Opp. 2-3.)  Metedeconk emphasizes that it utilized the phrase "demand loan" in the

first instance only because it does not possess signed copies of the promissory notes on which it

is suing.  (See id.)  In response to plaintiff's contentions, Metedeconk now moves to amend its

second counterclaim to reflect its intention to sue on the Notes.  (See id. at 4-6.)  As a court may

grant leave to amend and may at the same time consider that amendment on a motion for

summary judgment, see, e.g., Cline v. 1-888-Plumbing Group, Inc., 146 F. Supp. 2d 351, 363-64 (S.D.N.Y. 2001), Metedeconk's petition for leave to amend is granted and the Court considers its counterclaim as if it is based on the two promissory notes described above.

"The Supreme Court has interpreted Rule 15 to permit . . . amendments when the party seeking the amendment has not unduly delayed, the party is not acting in bad faith or with a dilatory motive, the opposing party will not be unduly prejudiced, and the amendment is not futile." Cline, 146 F. Supp. 2d at 363, citing Foman v. Davis, 371 U.S. 178, 182, (1962). Plaintiff has made no showing that defendants have unduly delayed or acted in bad faith.[22] Moreover, there is no conceivable prejudice to plaintiff in permitting the amendment.  Plaintiff has been aware of the promissory notes since early in the litigation.  Not only did he reference the Notes in his amended complaint (see Am. Compl. ¶ 55), admit that they were executed and delivered (id.), and answer questions about them during the course of his deposition (Kwon Dep. 142-43), but he also filed a spoliation motion when defendants failed to produce signed and executed copies of them.  (See P. Mem. 3-4.)  Plaintiff has thus had ample time to prepare a defense to Metedeconk's attempt to recover on the Notes.  This is evidenced by his fully briefed motion for summary judgment seeking to dismiss Metedeconk's claim under the Notes. Moreover, even if the Court were to deny Metedeconk's motion for leave to amend, Metedeconk would be free to file a new action to recover on the Notes.  For the foregoing reasons, the motion

---

[22] Although plaintiff makes much of Metedeconk's "delay" in changing its reference to a demand loan to reflect its intent to sue on the Notes (P. Reply Mem. 1-2), Metedeconk has credibly argued that its reference to a demand loan was a reflection of its inability to produce executed copies of the Notes (See Metedeconk Opp. 2-3), not of its failure to appreciate or convey the importance of the Notes as the basis of its claim.  Under these circumstances, the Court finds Metedeconk's delay an insufficient basis for denying its requested amendment.

to amend is granted.  Because the parties have submitted briefs on Metedeconk's right to recover on the Notes, the Court will address the amended counterclaim here on summary judgment.

B.    Capacity To Sue

Plaintiff argues that his motion for summary judgment should be granted because Metedeconk, a Delaware LLC, was dissolved in December 2003 and therefore lacks capacity to sue.  (P. Mem. 4-6.)  Although Metedeconk argues that, pursuant to 6 Delaware Code § 18-805, the Delaware Chancery Court has appointed Yun sole trustee of Metedeconk, including for the purpose of pursuing the debt that Metedeconk alleges Kwon owes it (see Stein Supp. Decl. Ex. 8; Metedeconk Mem. 6-7), plaintiff contends that – similar to 8 Delaware Code § 279 – § 18-805 does not permit a court to revive a dissolved Delaware LLC.  (P. Reply Mem. 3-5.)  Because plaintiff's reading of § 18-805 not only ignores meaningful differences between § 18-805 and § 279, but also misconstrues applicable precedent, his motion for summary judgment on this ground is denied.

As an initial matter, plaintiff's argument founders on the simple fact that the Delaware Chancery Court issued a final judgment and order appointing Yun trustee for Metedeconk and permitting him "to act in Metedeconk's name in all judicial proceedings," including the instant proceeding.  (Stein Supp. Decl. Ex. 8.)  In doing so, the Chancery Court implicitly concluded that § 18-805 may be applied to "revive" an otherwise dead entity for purposes of prosecuting and defending suits.  While plaintiff urges this Court to hold that the Chancery Court misread its own state statute, this Court defers to the judgment of the Delaware courts, which have far more expertise in construing their own law and are widely recognized as leaders in the area of corporate law.  Even if the Court were to decide the issue *de novo*, however, it would reject

36

plaintiff's reading of the statute for the reasons discussed below.

According to Delaware law:

> When the certificate of formation of any limited liability company
> formed under this chapter shall be canceled by the filing of a
> certificate of cancellation pursuant to § 18-203 of this title, the
> Court of Chancery, on application of any creditor, member or
> manager of the limited liability company, or any other person who
> shows good cause therefore, at any time, may either appoint 1 or
> more of the managers of the limited liability company to be
> trustees, or appoint 1 or more persons to be receivers, of and for
> the limited liability company, to take charged of the limited
> liability company's property, and to collect the debts and property
> due and belonging to the limited liability company, with the power
> to prosecute and defend, in the name of the limited liability
> company, or otherwise, all such suits as may be necessary or
> proper for the purposes aforesaid, and to appoint an agent or agents
> under them, and to do all other acts which might be done by the
> limited liability company, if in being, that may be necessary for the
> final settlement of the unfinished business of the limited liability
> company.  The powers of the trustees or receivers may be
> continued as long as the Court of Chancery shall think necessary
> for the purposes aforesaid.

6 Del. C. § 18-805.

In light of the absence of case law construing § 18-805, plaintiff argues that because it

"was modeled upon, and contains language identical to the long established, parallel provision of

the Delaware General Corporation Law ("DGCL"), [§ 279]," § 18-805 should be interpreted in

accordance with case law concluding that § 279 cannot revive a dissolved corporation beyond

the statutory wind-up period.  (P. Reply. Mem. 3-5.)  This argument is not, however, supported

by the texts of § 18-805 and § 279, their underlying statutory schemes, or applicable case law.

According to § 279:

37

> When any corporation organized under this chapter shall be
> dissolved in any manner whatever, the Court of Chancery, on
> application of any creditor, stockholder or director of the
> corporation, or any other person who shows good cause therefor, at
> any time, may either appoint 1 or more of the directors of the
> corporation to be trustees, or appoint 1 or more persons to be
> receivers, of and for the corporation, to take charge of the
> corporation's property, and to collect the debts and property due
> and belonging to the corporation, with power to prosecute and
> defend, in the name of the corporation, or otherwise, all such suits
> as may be necessary or proper for the purposes aforesaid, and to
> appoint an agent or agents under them, and to do all other acts
> which might be done by the corporation, if in being, that may be
> necessary for the final settlement of the unfinished business of the
> corporation.  The powers of the trustees or receivers may be
> continued as long as the Court of Chancery shall think necessary
> for the purposes aforesaid.

8 Del. Code § 279.  § 278 of the same title provides for a statutory wind-up period in which

corporations, whether they are dissolved or expire by their own limitations, are continued for

three years from the date of dissolution or expiration for purposes of prosecuting and defending

suits or otherwise winding up their affairs.  See 8 Del. Code § 278.

Unlike § 279, § 18-805 is not part of a statutory scheme that provides for a definitive

wind-up period.  Although § 18-803 contemplates that "the persons winding up the limited

liability company's affairs" may "prosecute and defend suits" "[u]pon dissolution of [the

company] and until the filing of a certificate of cancellation as provided in § 18-203 of this title,"

§ 18-805 appears to qualify the time limitation on an LLC's ability to prosecute and defend suits

by permitting the Court of Chancery to appoint a trustee "[w]hen the certificate of formation of

any [LLC] formed under this chapter shall be canceled by the filing of a certificate of

cancellation pursuant to § 18-203 of this title."

The case law cited by plaintiff does not address the impact of § 279 on a corporation's

38

ability to prosecute or defend suits following dissolution, much less compel the conclusion that § 18-805 cannot be invoked to permit a dissolved LLC to pursue an unpaid debt. In Marsh v. Rosenbloom, 499 F.3d 165 (2d Cir. 2007), the Second Circuit considered whether § 278 supercedes the trust fund doctrine, and concluded that "modern statutory remedies [had] effectively replaced the trust fund doctrine," such that the State of New York's claims in that case were barred by the expiration of the three-year statutory wind-up period. See id. at 173-76. Nowhere, however, did the court address the role of § 279.

In United States v. McDonald & Eide, Inc., 670 F. Supp. 1226 (D. Del. 1987), the court considered whether a corporation exists for tax purposes after the three-year statutory wind-up period. See id. at 1229-30. While the court concluded that a corporation does not exist after the wind-up period for these purposes, it noted that "Section 279 was intended to apply in situations where the three-year period has already expired and has been used when a corporation was dissolved for failure to pay franchise taxes." Id. at 1230; see also id. at 1231.

Although the Chancery Court mentioned § 279 in In re Citadel Industries, Inc., 423 A.2d 500 (Del. Ch. 1980), the issue before the court was whether certain amendments to § 278 permitted a party to have a corporation continued beyond the three-year wind-up period. See id. at 502-03. Although the court answered this question in the negative, its analysis did not address whether a similar result might obtain under § 279. See id. at 503-07. Indeed, after acknowledging that a corporation could not be continued beyond the wind-up period under § 278, it stated: "[O]nce the three-year period had expired[,] . . . any remaining unfinished business of the corporation could be completed only pursuant to § 279, and thus through a receiver or trustee appointed by the Court to act on behalf of the corporation and empowered to

39

do all necessary acts which might have otherwise been done by the corporation itself 'if in being.'" Id. at 505; see also id. at 506 ("Once a corporation is dissolved, . . . how can any court be expected to get everyone reconvened and reorganized so as to 'continue' the corporation as an entity for further winding up purposes?  No doubt this is one reason for the existence of § 279 in the first place."); id. at 507 (noting that after the three-year wind-up period had run, "the Court was only empowered, in its discretion, to appoint a receiver or trustee under § 279 to act on behalf of the corporation as though it were still 'in being.'").

This Court need not decide whether § 279 would permit appointment of a trustee to collect on the Notes if Metedeconk were a dissolved corporation.  It is clear that nothing in the cases cited by plaintiff supports his contention that § 18-805 precludes such action in the case of a dissolved LLC.  The plain language of the statute permits appointment of a trustee, and does not limit the time during which that authority can be exercised.  Moreover, the Delaware Chancery Court has construed its own state law to permit the appointment of a trustee in this very case.  Under these circumstances, there is no basis for this Court to give the statute a different construction.  For the foregoing reasons, Metedeconk possesses capacity to sue and plaintiff's motion for summary judgment is therefore denied on this ground.

C.    Promissory Estoppel

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  Because it is a quasi-contractual claim, however, promissory estoppel generally applies only in the absence of a valid and enforceable contract.

See, e.g., Levin v. Gallery 63 Antiques Corp., No. 04 Civ. 1504, 2006 WL 2802008, at *19 (S.D.N.Y. Sept. 28, 2006); Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.  A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.").  As neither party disputes the existence of an express agreement addressing repayment of the Loan, plaintiff's promissory estoppel claim is not legally cognizable.  See Levin, 2006 WL 2802008, at *19. Metedeconk is therefore granted summary judgment as to plaintiff's promissory estoppel claim.

     D.     Breach of Contract

     To establish a prima facie case for recovery under a promissory note, Metedeconk must "show proof of a note and failure to make payment."  Camofi Master LDC v. College Partnership, Inc., 452 F. Supp. 2d 462, 470 (S.D.N.Y. 2006), quoting Eisenstein v. Kelly Music Entm't Corp., No. 97 Civ. 4649, 1998 WL 289734, at *4 (S.D.N.Y. June 4, 1998); see also Middle East Bank v. Harmony Sportswear, Inc., No. 93 Civ. 228, 1994 WL 74057, at *4 (S.D.N.Y. Mar. 10, 1994).  Once it has made this showing, "the burden shifts to [Kwon] to prove the 'existence of a triable issue of fact in the form of a bona fide defense against the note.'" Camofi, 452 F. Supp. 2d at 470, quoting Nat'l Union Fire Ins. Co. v. Keenan, No. 93 Civ. 6784, 2005 WL 736233, at *1 (S.D.N.Y. Mar. 31, 2005) (quotation omitted).

     Here, Kwon does not dispute that he borrowed $390,000 pursuant to two promissory notes with fixed maturity dates and interest rates (see P. Mem. 2; cf. Am. Compl. ¶ 55), or that

41

he has failed to make any payments on either note.  Instead, he argues that defendants have not

complied with Section 3-804 of the Uniform Commercial Code, that they either cancelled or

voluntarily distributed the Loan, and that they fraudulently induced him to enter into the

agreements.[23]  (P. Mem. 4; P. Opp. Mem. 3-5, 7-11.)

        1.      <u>Loss of Executed Loan Agreement</u>

"Under Article 3 of the New York Codification of the Uniform Commercial Code

("N.Y.U.C.C.") (Mc[K]inney 1991), promissory notes constitute valid negotiable instruments if

they contain an unconditional promise to pay a sum certain, are signed by the maker, and are

payable to order or bearer on demand or at a definite time."  <u>Cavendish Traders, Ltd. v. Nice</u>

<u>Skate Shoes, Ltd.</u>, 117 F. Supp. 2d 394, 399 (S.D.N.Y. 2000), citing N.Y.U.C.C. § 3-104(1).

Because the Notes at issue contain an unconditional promise to repay the $390,000 borrowed by

plaintiff, were executed by plaintiff, and are payable to Metedeconk at a fixed time, they are

subject to the N.Y.U.C.C.  In light of this fact, plaintiff argues that Metedeconk's counterclaim

should be dismissed because it has not complied with N.Y.U.C.C. § 3-804.

        § 3-804 provides that:

> The owner of an instrument which is lost, whether by destruction,
> theft or otherwise, may maintain an action in his own name and
> recover from any party liable thereon upon due proof of his
> ownership, the facts which prevent his production of the
> instrument and its terms.  The court shall require security, in an
> amount fixed by the court not less than twice the amount allegedly

---

[23] Plaintiff's assertion that the Notes are not enforceable because of illegality or because of defendants' unclean hands can be rejected at the outset.  Plaintiff has not shown that any incidental aspects of the Notes, much less their main objectives, were for an illegal purpose. Furthermore, because "unclean hands is an equitable defense that does not apply to actions at law that seek money damages," it is inapposite.  <u>JSC Foreign Econ. Ass'n Technistroyexport v. Int'l Dev. & Trade Servs., Inc.</u>, 386 F. Supp. 2d 461, 477 (S.D.N.Y. 2005).

> unpaid on the instrument, indemnifying the defendant, his heirs,
> personal representatives, successors and assigns against loss,
> including costs and expenses, by reason of further claims on the
> instrument, but this provision does not apply where an action is
> prosecuted or defended by the state or by a public officer in its
> behalf.

N.Y.U.C.C. § 3-804.  Because Metedeconk has not produced an executed copy of the Notes, its

attempt to recover on the Notes is governed by § 3-804.

Although Metedeconk has not posted security, it is unclear whether the posting of

security is mandatory or merely discretionary.  The provision's use of the word "shall" rather

than "may" supports plaintiff's contention that the posting of security is a mandatory

requirement.  The Official Comment to § 3-804, however, suggests that the requirement is

discretionary.  See id. ("There may be cases in which so much time has elapsed, or there is so

little possible doubt as to the destruction of the instrument and its ownership that there is no

good reason to require the security.  The requirement is therefore not an absolute one, and the

matter is left to the discretion of the court.")  The applicable case law also is inconsistent.  See

Citibank, N.A. v. Benedict, No. 97 Civ. 9541, 2000 WL 322785, at *5 n.4 (S.D.N.Y. Mar. 28,

2000) (relying on the Official Comment as support for the conclusion that the posting of security

"is not a mandatory prerequisite for the invocation of § 3-804"); 487 Clinton Ave. Corp. v.

Chase Manhattan Bank, 313 N.Y.S.2d 445, 447 (N.Y. Sup. Ct. 1970) (noting that, despite the use

of the word "shall," it does not appear that the legislature intended for "strict compliance" with §

3-804's security requirement to be "compulsory in all cases").  But see Sills v. Waheed Enters.,

Inc., 676 N.Y.S.2d 170, 171 (1st Dep't 1998) (concluding, without advancing any reasoning, that

plaintiff should have been required to post security under N.Y.U.C.C. § 3-804); Matter of Diaz

v. Mfrs. Hanover Trust Co., 92 Misc. 2d 802, 804-06 (N.Y. Sup. Ct. 1977) (disagreeing with 487 Clinton Ave. Corp. and rejecting petitioner's request to recover on a lost negotiable instrument without posting security on the ground that the word "shall" in N.Y.U.C.C. § 3-804 "was added to our statute to make the furnishing of security mandatory rather than discretionary").

While the question is a close one, the Court concludes that, on balance, there is no reasonable ground for requiring security here. This litigation has been pending for more than four years. No other party has asserted any claim based on the Notes, and – aside from plaintiff's claim that the Notes were distributed to a member of Metedeconk – there is no evidence that the Notes have been negotiated or transferred to any other party. Moreover, Kwon does not dispute that he borrowed the money, received the funds, and failed to repay.

Even if the Court determined that the posting of security was mandatory, the correct remedy would be to require Metedeconk to post security, not to dismiss its claim. That plaintiff does not request that Metedeconk be required to cure its purported defect, but instead requests only that the action be dismissed, suggests that his reliance on § 3-804's security requirement is nothing more than an attempt to escape undisputed obligations on the basis of a mere technicality. A debtor may not, however, rely on such a technical and eminently curable procedural defect to avoid payment of a just debt. For these reasons, plaintiff's motion for summary judgment is denied in this respect.

### 2.   Cancellation or Distribution of Loan

Plaintiff also contends that Metedeconk either cancelled or voluntarily distributed the Loan upon dissolution. (P. Opp. Mem. 3-5.) In support of this argument, he cites a list of assets created by Metedeconk in 2002 that omits the Loan, and an account ledger purporting to show

may be entitled to relief, but any such damages must be set off by amounts Kwon *did* receive, in the form of a loan that has never been repaid, unless defendants have since negotiated or distributed the Notes to another party.

For these reasons, defendants are granted summary judgment as to plaintiff's fraudulent inducement defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to plaintiff's negligent misrepresentation claim, as well as his claim that his affiliation with defendants has prevented him from obtaining full-time employment, but denied in all other respects. Defendants' motion to amend the second counterclaim is granted, and defendants are granted summary judgment as to plaintiff's promissory estoppel and fraudulent inducement counterclaim defenses. Plaintiff's motion for summary judgment is denied in all respects.

SO ORDERED.

Dated: New York, New York
       March 4, 2009

GERARD E. LYNCH
United States District Judge